No. 59,833

ATCHISON COUNTY FARMERS UNION CO-OP ASSOCIATION, *Appellant,*
v. RAYMOND TURNBULL, *Appellee.*

(736 P.2d 917)

Opinion filed May 1, 1987.

*Michael J. Grady,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and *Lauren M. Lowry,* of the same firm, was with him on the briefs for appellant.

*David C. Van Parys,* of Murray & Tillotson, Chartered, of Leavenworth, argued the cause, and *John C. Tillotson,* of the same firm, was on the brief for appellee.

*Terry D. Bertholf,* of Hutchinson, was on the brief for *amicus curiae* National Council of Farmer Cooperatives.

*Kari S. Schmidt,* of Wichita, was on the brief for *amicus curiae* Wichita Bank for Cooperatives.

*David W. Dewey,* of Wallace, Dewey & Zimmerman, of Wichita, was on the brief for *amicus curiae* Kansas Cooperative Council.

The opinion of the court was delivered by

LOCKETT, J.: Plaintiff Atchison County Farmers Union Cooperative Association (Co-op) appeals the Atchison County District Court decision allowing the defendant, Raymond Turnbull, to set off his Co-op equity credit account against an open account indebtedness he owed to the Co-op.

The Co-op is a non-profit association organized under K.S.A. 17-1601 *et seq.* Headquartered in Atchison, Kansas, the Co-op provides services to approximately 2,000 members. Turnbull has been a member of the Co-op since 1965 and regularly purchased farm goods and materials on an open account.

Profits made by the association from member businesses are returned to the individual member on a pro rata basis of his business to that of the total membership. The profit allocations are either cash patronage refunds or are credited to the member's equity credit account. As a member, Turnbull received both cash patronage refunds and credits to his equity credit account. In 1983 his equity credit balance with the Co-op was $17,332.98. In early 1983, Turnbull ceased farming operations and applied for liquidation of his equity account, but his request was denied by the Co-op Board of Directors.

In May of 1985, the Co-op filed suit to collect Turnbull's unpaid open account debt of $11,673.04, with interest at the rate of 18 percent per annum. Turnbull counterclaimed, suggesting that his $17,732.98 in patronage dividends be set off against the balance due on his open account. Turnbull also claimed that the interest charged by the Co-op was usurious.

At trial, the general manager of the Co-op testified as to the structure of the Co-op and relevant provisions of the articles and bylaws. He stated that at the time Turnbull applied for payment of his equity account, there were no bylaw provisions or policies of the Board allowing liquidation, although the bylaws allowed the payment of equities at the death or retirement of a member.

The trial court granted the Co-op judgment on the open account debt and, based on the equitable principle of unjust enrichment, allowed Turnbull a setoff of his equity credits up to the amount of the Co-op's judgment. The Co-op appeals, contending Turnbull's equity credit account cannot be set off against the indebtedness owed.

The purpose of cooperative marketing is to promote the intelligent and orderly marketing of agricultural products through cooperation. It is designed to eliminate speculation and waste and to make distribution of agricultural products as direct as possible between producer and consumer. K.S.A. 17-1601. The paramount concern of such associations is to provide a means of

marketing the products of their members, not the advancement of the individual members. *Claassen, Executrix v. Farmers Grain Cooperative*, 208 Kan. 129, Syl. ¶ 3, 490 P.2d 376 (1971).

Nonprofit cooperative associations are organized under the provisions of the Kansas Cooperative Marketing Act, K.S.A. 17-1601 *et seq.*, to make profit for their members as producers. K.S.A. 17-1602. The affairs of cooperative associations are managed by boards of directors. K.S.A. 17-1611. The articles of incorporation and bylaws of an association provide the means to obtain the necessary funds or capital to pay the expense of operations and acquire property necessary to carry out its purposes. The bylaws may state the amount of annual dividends which may be paid on stock and the manner in which the remainder of the association's profits shall be prorated in the form of patronage dividends to its stockholders. K.S.A. 17-1609.

Section 3 of Article IX of the Co-op's bylaws provide that "the balance of the allocation due all members and associate members may be paid in cash, common stock, preferred stock, nonvoting associate membership certificates, equity credits or any combination thereof at the discretion of the board of directors."

Section 8 of Article IX of the bylaws allows the establishment of an equity credit fund. Every patron eligible to receive a patronage allocation is required to contribute to the fund the net savings remaining in his credit after the payment of the cash allocations. The equity credit is equivalent to payment in cash to the fund and used as capital for the continued operation of the association.

The bylaws of the Co-op provide for the retention of up to 80 percent of the operating profits that are allocated to Co-op members in order to furnish capital for the Co-op. Each member of the Co-op is credited with his proportionate share of furnished capital on the books of the Co-op. This deferred patronage allocation is termed "equity credits" and may be paid out or redeemed only at the discretion of the board of directors.

Equity credits are not an indebtedness of a cooperative association which is presently due and payable to the members, but represent an interest which will be paid to them at some unspecified later date to be determined by the board of directors. Such equity credits represent patronage dividends which the board of

directors of a cooperative, acting under statutory authority, has elected to allocate to its patrons, not in cash or other medium of payment, which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital. 18 Am. Jur. 2d, Cooperative Associations § 23.

There are no Kansas cases discussing the right of a member of a cooperative association to set off equity credits against the member's debts. In *Claassen, Executrix v. Farmers Grain Cooperative,* 208 Kan. 129, the executrix sought to recover a money judgment against Farmer's Grain based on credits earned by the deceased during his lifetime as a member and patron of the cooperative association. The court noted that patronage ledger credits were different from stock purchased by a member and that their characteristics made them capital investments, as distinguished from debts. The court concluded since neither the articles of incorporation nor the bylaws of the defendant provided for a mandatory payment of the patronage ledger credits to a decedent's estate, it was a matter of discretion with the board of directors whether to pay such. The executrix pointed out that the board had paid such credits to other estates. This court determined, however, that it could not substitute its judgment for the judgment of the board of directors and declined to become involved in the financial structure of the cooperative to determine whether the board of directors acted reasonably. For similar cases from other jurisdictions, see *Howard v. Eatonton Coop. Feed Co.,* 226 Ga. 788, 177 S.E.2d 658 (1970); *Clarke County Co-op (AAL) v. Read,* 243 Miss. 879, 139 So.2d 639 (1962); and *Evanenko v. Farmers Union Elevator,* 191 N.W.2d 258 (N.D. 1971). We have also refused to interfere on behalf of a dissatisfied stockholder with the discretion of the boards of directors of other types of corporations on questions of corporate management, policy, or business. *Sampson v. Hunt,* 233 Kan. 572, 584-85, 665 P.2d 743 (1983).

Bylaws of a cooperative association organized under K.S.A. 17-1601 *et seq.* are a contract between the cooperative and its members or stockholders and govern transactions between them. Equity credits constitute an interest of a stockholder of a coop-

erative association which is contingent and not immediately payable. The interest becomes vested when the board of directors, following the bylaws, exercises its sound discretion and determines that such payments can be made without causing undue financial hardship to the association. A member or a stockholder of a cooperative association is bound by the bylaws and cannot contend that when equity credits are allocated upon the books of the association that an indebtedness is created which can be used as a setoff against a debt the member or stockholder owes the association.

The bylaws of the Co-op provide that equity credit accounts of members may be retired for estate settlement purposes to those members attaining age 65 or to those members removing their farm operation from the Co-op's trade territory. Turnbull argues, however, that principles of equity require that he be allowed to set off his credits against his debts because he last produced agricultural products in 1981. Prior to trial, Turnbull had lost his home and all of his farmland. His farm equipment was sold in March 1982.

The Kansas Code of Civil Procedure modified the general rule that, in order to be available as a setoff or counterclaim, a claim or demand of a defendant against a plaintiff must be due and owing at the commencement of the action. 20 Am. Jur. 2d, Counterclaim, Recoupment, Etc. § 57; 80 C.J.S., Set-off and Counterclaim § 29. A claim which either matured or was acquired by the pleader after serving the pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading. K.S.A. 1986 Supp. 60-213(e). This is based on the principle that all issues between the parties should be determined in one action. To allow a debt not maturing during an action to be set off against one already due would be to change the contract and advance the time of payment. Equitable setoffs of unmatured obligations may be allowed under special circumstances, such as insolvency of the obligor or probable difficulty in collecting the obligation at maturity, but such setoffs are largely within the court's discretion.

In this case, the trial court relied on *H. Freeman & Son v. Henry's, Inc.*, 239 Kan. 161, 717 P.2d 1049 (1986), in finding that setoff applied to the present situation. In *H. Freeman & Son v.*

*Henry's Inc.,* Henry's ordered certain merchandise from the William B. Kessler Company, not knowing the supplier had filed for bankruptcy. At the time, Henry's had a credit balance with Kessler in excess of the value of the goods ordered. Kessler had sold the distribution rights to that line of goods to H. Freeman & Son. Freeman filled the order and shipped the goods to Henry's. Freeman later sued Henry's for the cost of the goods. This court held that since Henry's had no notice of the change in ownership and that it had a credit balance with Kessler at the time of the order which would have covered the cost of the goods, it would be inequitable for Henry's to pay again for the merchandise.

An equitable setoff will be allowed when the party seeking it shows some equitable ground therefor, and it is necessary to promote justice, to avoid or prevent wrong or irremediable injustice, or to give effect to a clear equity of the party seeking it. There is some authority to the effect that the equitable grounds which will warrant overriding the statutory law have been limited to insolvency or nonresidence, but it is generally held that these are not the sole grounds. 80 C.J.S., Set-off and Counterclaim § 5.

The trial judge found it was inequitable for the Co-op to sue Turnbull on his debt and allow the Co-op to refuse to set off Turnbull's equity credits against that debt. Adopting the principle of equitable setoff due to insolvency, the trial judge overrode the Co-op's bylaws and the statutory law and allowed Turnbull to set off his equity credits against his debt to the Co-op. It is therefore necessary to determine whether the legislature has made a statement of public policy which prohibits the trial judge from overriding the statutory law and applying equitable principles.

In giving and withholding relief, courts of equity go much further in promoting of the public interest than when only private interests are involved. Accordingly, the granting or withholding of relief properly depends upon considerations of public interest. If the granting of relief to an individual will be prejudicial to the public interest, the public interest must be protected. "Public policy" is that principle of law which holds no individual can lawfully do that which has a tendency to be against the public good.

Permeating each of the conclusions in *Claassen, Executrix v. Farmers Grain Cooperative*, 208 Kan. 129, was the statement of public policy that cooperative marketing associations are fostered and encouraged by legislative enactment and judicial construction; that the inception of these organizations was deemed to be for the personal benefit of members only to the extent that the individual profited through the operation of the enterprise; and that the paramount concern was not the advancement of the individual interest as such. Furthermore, a member's demand for service is responsible for the creation of a cooperative association and as a means of marketing his produce during the period of his membership, and there is no logical ground upon which a member should be permitted to withdraw his interest at the expense of disturbing the financial condition or the life of the association. 208 Kan. at 134.

It is the declared public policy of this state to encourage cooperative marketing associations. The trial judge could neither grant an equitable setoff to Turnbull nor substitute his judgment for the Co-op's board of directors.

Turnbull filed a cross-appeal contending that the court erred in computing the interest on his indebtedness at a rate of 18 percent rather than the statutory rate of ten percent. Turnbull argues that he never contracted to pay the 18 percent rate and he, therefore, should not be liable for that amount.

Generally, the rate of interest is fixed by statute unless the parties have contracted for a different rate. K.S.A. 16-201. The mere statement of a charge in an invoice without evidence that the parties agreed to such a rate is not sufficient to establish a contract varying the rate of interest. *Scott v. Strickland*, 10 Kan. App. 2d 14, 24, 691 P.2d 45 (1984).

Each billing statement sent Turnbull by the Co-op stated that a finance charge of "1.50% per month which is an ANNUAL PERCENTAGE RATE of 18.00%" would be charged. In addition, the billing statements showed the member's previous balance and current finance charge. The trial court found that there was an implied agreement to pay the 18 percent interest.

Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally or explicitly stated in words. In an implied contract, one or more of the terms and

conditions are implied from the conduct of the parties. See *Williams v. Jones,* 105 Kan. 282, 182 Pac. 391 (1919). A contract implied in fact arises from facts and circumstances showing mutual intent to contract. *Mai v. Youtsey,* 231 Kan. 419, 422, 646 P.2d 475 (1982).

In *Jerry L. Phillips, Inc. v. Ratley,* 6 Kan. App. 2d 157, 627 P.2d 339 (1981), Phillips had agreed to drill and equip two wells for Ratley. The wells were dry and Ratley refused to pay. Phillips sued, asking for damages for services and materials plus interest on the unpaid amount. The court said that an agreement to pay interest can be implied from (1) a seller's notice to a buyer that interest will be charged on an unpaid account and (2) the buyer's acquiescence.

In *Johnson Tire Service, Inc. v. Thorn, Inc.,* 613 P.2d 521 (Utah 1980), the plaintiff initiated an action to recover the balance owing for tires purchased by the defendant on open account, together with interest and attorney fees. The court said that where the buyer received monthly statements which reflected the charging of interest at a rate of 18 percent per annum by the seller, and where the defendant made payments thereon, without objection, these facts were sufficient to establish a course of conduct, dealing, or performance which would imply an agreement to pay interest.

Here, Turnbull, who had stated his antipathy toward the interest rate to employees of the Co-op, was obviously aware of the 18 percent rate charged by the Co-op. He made one payment on his account, but contends that that was not sufficient to establish a course of dealing creating an implied contract. While Turnbull made only one payment, he did purchase items from the Co-op on more than one occasion. Under the circumstances, where Turnbull had knowledge of the credit terms and continued to do business with the Co-op, the trial court was correct in finding that Turnbull had impliedly agreed to pay the 18 percent interest rate.

Affirmed in part, reversed in part, and remanded with directions for the district court to enter judgment in accordance with this opinion.