**Don H. HULLMAN, Plaintiff,**

v.

**BOARD OF TRUSTEES OF PRATT COMMUNITY COLLEGE,**
**Defendant.**

No. 86–4026–C.

United States District Court,
D. Kansas.

Nov. 29, 1989.

Wesley A. Weathers, Weathers & Riley, Topeka, Kan., for plaintiff.

David J. Morgan and H.E. Jones, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion of defendant, Board of Trustees of Pratt Community College (Board), for summary judgment. Plaintiff, Don H. Hullman, was the Dean of Instruction at Pratt Community College (PCC) for nine years until he was transferred in July of 1985 to the position of Dean of Continuing Education. On August 6, 1985, defendant Board decided against renewing plaintiff's contract for the stated reason that it did not wish to accept the plaintiff's offered conditions. Because of these adverse actions, plaintiff brings the present suit alleging constitutional violations of his rights under the First Amendment and to procedural due process and asserting a state common-law claim for breach of contract. Defendant seeks oral argument on its motion for summary judgment on all of Hullman's claims. The defendant's request is denied, since oral argument would not materially aid the court in deciding the pending motion.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

■ An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. 477 U.S. at 249, 106 S.Ct. at 2510. Where reasonable minds would not differ over the import of the evidence and could only reach one conclusion as to the evidence, summary judgment is appropriate. 477 U.S. at 250, 106 S.Ct. at 2511.

■ The movant's initial burden under Fed.R.Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon,* 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). "[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden." *Windon,* 805 F.2d at 345 n. 7. The movant, however, does not have the burden to prove a negative, that is, to disprove the nonmoving party's evidence. *Id.* at 346. It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th.Cir.1987).

■ The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon,* 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important proce-dure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Plaintiff moves to strike that portion of defendant's reply brief in which additional uncontroverted facts appear. The motion is granted to the extent indicated below. For purposes of the summary judgment motion, the court finds the following facts to be uncontroverted.

1. Plaintiff, Don Hullman, was employed by PCC for nine years as Dean of Instruction pursuant to a series of one-year or two-year contracts. Beginning in 1981, plaintiff's contracts of employment were for one-year terms.

2. Plaintiff was appointed Interim President of PCC for the summer and fall of 1981 until Dr. John Gwaltney took over as President in November of 1981. During his stint as Interim President, plaintiff called an executive session of the Board during which he alleged that certain financial improprieties had been discovered in PCC's budget. Some members of the Board were startled and upset by plaintiff's comments.

3. In February of 1984, the Board approved the recommendation of Dr. John Gwaltney, President of PCC, to reemploy plaintiff and others. The 1984–1985 employment contract for plaintiff was dated May 9, 1984, and signed by plaintiff on May 25, 1985, and it provided in pertinent part:

> The Board hereby employs and the Administrative Employee hereby accepts employment for the period beginning July 1, 1984 and ending on June 30, 1985, in an administrative capacity to perform the following administrative services: Dean of Instruction in charge of Transfer Studies subject to the terms and conditions of this Contract.

(Gwaltney Depo. Ex. 3). Plaintiff's salary for this period was $37,861.

4. In 1984, the plaintiff wrote and sent certain memoranda to President Gwaltney and other administrators which questioned the financial budgets for the Adult Supple-

mental Education Fund (ASEF), the legality of using that fund to pay some salaries, and the taking of student instructional fees to pay for PCC's scholarship programs. Plaintiff also differed on occasion with President Gwaltney over increased funding of the vocational department, increased personnel at satellite sites, higher wages for continuing education directors, budget allotments for continuing education, and necessary funding for the library and athletics.

5. At its meeting on March 11, 1985, the Board approved President Gwaltney's recommendation that several of the administrative and operational personnel, including the plaintiff, be reemployed. On July 15, 1985, the Board approved President Gwaltney's recommendation on the following appointments: James Stratford, Dean of Administrative Services, at a salary of $2600 plus present contract; Lynn Cundiff, Dean of Academic and Vocational Instruction, at a salary of $2600 plus present contract; and Don Hullman, Dean of Continuing Education Out District, at a salary of $2600 plus present contract.

6. In early July of 1985, President Gwaltney met with plaintiff and discussed his intentions of recommending plaintiff for the assignment of dean of continuing education, and he requested plaintiff to draw up a job description for that position.

7. Upset with this proposed reassignment, plaintiff delivered a written memorandum on July 10, 1985, to President Gwaltney wherein he requested "a special meeting with the Board of Trustees at the next scheduled board meeting." (Gwaltney Depo. Ex. 7).

8. The following day, July 11, 1985, plaintiff took a vacation day from his job at PCC and traveled to Topeka where he met with Dr. Harold Blackburn, the Commissioner of the Kansas Department of Education, and Mr. Dale Dennis, Assistant Commissioner. They knew that plaintiff was an administrator at PCC. During the meeting, plaintiff raised questions regarding funding of student scholarships and the management of the ASEF. They were unable to answer his questions at that time. While it was not unusual for them to con-

tact the other school officials if there was a problem, neither Blackburn nor Dennis could recall that they or other office staff contacted any PCC officials about this meeting with Hullman.

9. On the next day, July 12, 1985, President Gwaltney and Phil Farmer, a Board member, visited the Board's attorney and requested a legal opinion on the Board's rights in regards to an administrator who was performing unsatisfactorily and whose contract either had been renewed by the Board or had not been offered by the Board. They requested that the opinion be provided before the Board meeting on July 15, 1985. The Board's attorney provided his written opinion on July 15th, and a copy of the letter was placed in plaintiff's personnel file.

10. Plaintiff spoke with the Board during executive session on July 15th without President Gwaltney present. The Board's minutes reflect that they were in executive session from 9:00 p.m. to 12:15 a.m. and then returned to open session and approved President Gwaltney's recommendation on dean assignments. During the meeting, plaintiff apparently made a comment that PCC's administration of the scholarship fund was illegal. (At this point, the court notes that plaintiff has repeatedly used record citations as "See e.g." in the apparent attempt to create an inference of a practice or that the citation is representative of the weight of the evidence. Neither inference is reasonable without additional citations.)

11. On July 16, 1985, President Gwaltney distributed a flow chart to PCC faculty showing the reorganization. Because plaintiff had failed to submit his job description as requested, the flow chart did not reflect plaintiff's responsibilities. President Gwaltney prepared the initial draft of the job description and submitted to plaintiff for his review on July 22nd.

12. The plaintiff wrote the Board president a letter dated July 22, 1985, requesting a due process hearing on its decision reassigning him to the position of Dean of Continuing Education. Plaintiff explained that he considered the Board's action to be

a demotion and that he wanted the "opportunity to present evidence, ... cross-examine witnesses, and be represented by counsel." (Gwaltney Depo. Ex. 15).

13. At its meeting on July 29, 1985, the Board voted unanimously to deny plaintiff a due process hearing. The Board Chairman also issued the following statement at that time:

> The Pratt Community College Board met in excess of two hours with Dr. Hullman on July 15, 1985, to hear his concerns about the possible transfer to the Dean of Continuing Education. The Board at that time heard nothing to change the recommendation of the President. The Board continues to support the recommendation previously made.

(Gwaltney Depo. Ex. 19).

14. A "Contract for Administrative Services" was delivered to plaintiff on July 19, 1985. The contract was not signed by any Board representative. It specified compensation in the amount of $40,461 and designated plaintiff's administrative position as Dean of Continuing Education. The contract also provided:

> The Administrative Employee agrees to perform such administrative services and such other duties and services as the Board and its authorized representatives may direct, and to abide by all applicable present and future rules, regulations and policies of the Board, which shall be incorporated herein by reference and made a part of this Contract.

(Gwaltney Depo. Ex. 10). The contract also included the following restriction: "This Contract shall be null and void if not signed by the duly authorized representative of the Board and by the Professional Employee and returned to the Board on or before July 30, 1985."

15. Plaintiff returned the contract signed with an attachment to President Gwaltney on July 30, 1985. Plaintiff attached a written memorandum which read, in pertinent part:

> Enclosed herewith is the executed contract of employment with Pratt Community College for the 1985–86 academic year. Please be advised that I have signed this contract under protest, in that, in my opinion, it infringes upon my property interest in continued employment in my former position as Dean of Instruction. Execution of this contract should not be construed as a waiver of any rights I might have to retain the former position or to contest the reassignment.

(Gwaltney Depo. Ex. 20).

16. On July 31, 1985, plaintiff met with President Gwaltney and the Board chairman about the plaintiff's attachment to the contract. The chairman requested plaintiff to remove the memorandum. Plaintiff responded in a letter dated August 6, 1985, as follows in relevant part:

> If you wish to unstaple the attached statement from the contract, feel free to do so. I did submit both the contract and statement on July 30, 1985 and will not withdraw the statement. I did indeed sign the contract under protest, in that, in my opinion, it infringes upon property interest in continued employment in my former position as Dean of Instruction.

(Gwaltney Depo. Ex. 21).

17. At its August 6, 1985, meeting, attended by plaintiff, the Board voted "to not accept the contract for administrative services of Dr. Don Hullman with the conditions that have been imposed by attachment to the contract dated July 3, 1985, nor the conditions recited in Dr. Hullman's August 6, 1985 correspondence." (Gwaltney Depo. Ex. 22). In a letter to plaintiff dated August 7, 1985, the Board explained that it considered plaintiff's signing of the contract under protest with the attachment to be a conditional acceptance of the Board's offer and, therefore, a counteroffer. (Gwaltney Depo. Ex. 23).

18. Plaintiff has testified by deposition that he did not intend his signing under protest and attaching of a memorandum to constitute a conditional acceptance. Instead, he saw it as merely an expression of rights that he believed he already possessed.

19. Because of the emotional level of the issue, President Gwaltney instructed a security guard to spend the night of Au-

gust 6, 1985, at the business complex and to monitor the administrative offices. Gwaltney also told each of the deans, including the plaintiff, to not report to work before 8:00 a.m. the next day as a security guard had been posted. Gwaltney arrived at work the next day at 7:50 a.m., and the security guard had detained plaintiff and his secretary from entering their offices.

20. The Board released the following official statement to the local media, which appeared as a newspaper article in the Pratt Tribune on August 7, 1985:

At a special called board meeting, Pratt Community College's Board of Trustees considered Dr. Hullman's administrative contract. Legal counsel advised the Board of Trustees that an attached document to Dr. Hullman's returned contract signed under protest constituted a counter-offer rather than acceptance. The original contract offer had expired on July 30, 1985.

The Board of Trustees rejected Dr. Hullman's counter-offer believing the Board retained the right to reassign, promote, demote and alter duties of any administrative personnel under Kansas Statutes and its Board policies.

The actions of the Board of Trustees was deemed necessary to maintain control over the operations of the institution.

(Gwaltney Depo. Ex. 24).

21. Between August 7, 1985, and September 23, 1986, plaintiff's applications were denied for the positions of president at Allen County Community College and Pratt County Community College.

## FIRST AMENDMENT

A state employer may not take adverse action against an employee on a basis which infringes the employee's constitutionally protected right to freedom of speech. *See Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *see also Wulf v. City of Wichita*, 883 F.2d 842, 856 (10th Cir. 1989). Inquiry into such a claim involves several steps.

First, the employee must show that his speech was constitutionally protected, that is, it addresses a matter of public concern and the employee's interest in making such a statement outweighs the state's interest in promoting an efficient public service. *Koch v. City of Hutchinson*, 847 F.2d 1436, 1440 n. 11 (10th Cir. 1988) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988) (referring to this step as the *Connick–Pickering* test and citing *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). This inquiry is ultimately one of law for the court to decide. *Starrett v. Wadley*, 876 F.2d 808, 816 (10th Cir.1989); *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988).

Second, the employee must prove that his speech was a substantial or motivating factor in the state's detrimental action. *Conaway v. Smith*, 853 F.2d 789, 795 (10th Cir.1988). This step raises a question of fact typically reserved for the fact-finder. *Id.* at 796 n. 8.

Third, if plaintiff satisfies the above two steps, then the employer is given the opportunity to prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected speech. *McEvoy v. Shoemaker*, 882 F.2d 463, 465 (10th Cir.1989). This is also a question of fact for the jury. *Melton v. City of Oklahoma City*, 879 F.2d 706, 713 (10th Cir.1989).

In its original memorandum, the defendant understood plaintiff's alleged protected speech to be his complaints over his reassignment to Dean of Continuing Education. Defendant's understanding is consistent with a literal reading of the pretrial order in this case. Defendant then argued such speech was unworthy of constitutional protection as it was concerned with personal employment matters rather than those political or social issues of public interest. Defendant also attacked the plaintiff's interest in complaining about his reassignment as being outweighed by PCC's interest in maintaining harmonious working relationships among the administrators.

In response, plaintiff revealed that his First Amendment claim is based on two

manners of protected speech: his prior criticisms and complaints of PCC's financial practices and his request for a due process hearing from the Board. While his criticisms of the financial practices allegedly caused his reassignment or demotion and ultimately motivated his termination or nonrenewal, plaintiff also asserted his request for due process resulted in his termination. Defendant now replies that plaintiff is unable to meet his evidentiary burden of showing his criticisms of the financial practices were a substantial or motivating factor to his reassignment or nonrenewal.

 Whether an employee's speech is a matter of public concern is determined from the " 'content, form, and context of a given statement, as revealed by the whole record.' " *Starrett*, 876 F.2d at 816 (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690). To be a public concern, "the speech must relate to a topic of political, social or other concern to the community." *McEvoy*, 882 F.2d at 466 (citing *Wulf v. City of Wichita*, 883 F.2d at 857). First Amendment protection is not automatically accorded all comments of general interest to the community. *McEvoy*, 882 F.2d at 466. Though the subject matter of the employee's speech in certain circumstances could be of general interest to the community, what was actually said on the topic must be of public concern. *Melton*, 879 F.2d at 713–14. In public employee disputes, the Supreme Court has noted:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147, 103 S.Ct. at 1690.

 In evaluating the issue of public concern, "[c]ourts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials in the conduct of their official duties." *Koch v. City of Hutchinson*, 847 F.2d at 1445. "Was the employee's point to bring wrongdoing to light or to raise other issues of public concern because they are of public concern, or was the point to further some purely private interest?" *McEvoy*, 882 F.2d at 466 (citing *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)). Plaintiffs cannot bring constitutional light to their personal grievances by bootstrapping them onto issues of public concern by general references to the manner in which public institutions are conducted. *Maples v. Martin*, 858 F.2d 1546, 1553 n. 12 (11th Cir.1988). However, the forum chosen to express those views is not determinative, since complaints communicated privately to superiors may still be protected. *Conaway v. Smith*, 853 F.2d at 797.

The Supreme Court has recognized that public employees cannot be required to relinquish their right to comment on public interest matters concerning the operation of public schools in which they work. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *see also Luethje v. Peavine School Dist. of Adair County*, 872 F.2d 352, 355 (10th Cir.1989). Courts have consistently found the public concern element satisfied when the speech discloses evidence of corruption, impropriety, wrongful conduct or malfeasance of public officials. *See e.g. Starrett*, 876 F.2d at 817; *Luethje*, 872 F.2d at 355; *Hall v. Ford*, 856 F.2d at 259–60 (comments concerning violations of NCAA rules and mismanagement of athletic department). On the other hand, speech on the internal administration of the educational system and personal grievances has not been found constitutionally protectable. *Maples v. Martin*, 858 F.2d at 1552 (and cases cited therein).

 Plaintiff's complaints over his reassignment to Dean of Continuing Education address only issues of the internal administration of PCC rather than matters of political or social import worthy of constitutional protection. *See Maples*, 858 F.2d at 1552. *Compare Ferrara v. Mills*, 781 F.2d 1508, 1515–516 (11th Cir.1986) (Complaints over college registration and

course assignments are not a public concern) *with Rankin v. Independent School Dist. No. I-3*, 876 F.2d 838, 843 (10th Cir. 1989) (Statements on school's methods of physically disciplining students address a public concern). His comments to the Board in executive session on July 15th and his later request for a due process hearing were obviously motivated by his desire to retain his position as Dean of Instruction. Nothing about the context or form of these comments evidence that they were calculated to disclose misconduct instead of personal disputes or grievances. Simply because the plaintiff chose to mention financial improprieties in the executive session does not elevate his comments regarding his personal grievance over the internal reassignment of his duties into a matter of public concern. *See Ferrara v. Mills*, 781 F.2d at 1516. "While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691.

Despite the above ruling, the court does consider plaintiff's criticisms of financial mismanagement in the ASEF and student scholarships made at other times to address issues of public concern. These allegations of the misuse of public funds were not made in the context of a personal employment grievance. This speech appears to have been intended to inform directly plaintiff's superiors, Dr. Gwaltney and the Board, of what he perceived to be improper or illegal conduct. His comments and memoranda sought to reveal potential wrongdoing in the financial control of certain funds of PCC.

Plaintiff's exercise of his right to criticize the financial mismanagement of PCC must be balanced against the defendant's interest in promoting the efficiency, integrity, and harmony of its public service. *Conaway*, 853 F.2d at 797. "[P]ertinent considerations [include] whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. at 388, 107 S.Ct. at 2899 (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37). The employer must show " 'that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.' " *Ware v. Unified Sch. D. 492, Butler County, Kansas*, 881 F.2d 906, 910 (10th Cir.1989) (quoting *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987)). A related requirement is that the employer must present *"some* ascertainable damage" as a result of the speech in question. *Melton*, 879 F.2d at 716 n. 11.

At this juncture, the balance favors the plaintiff's interest in revealing the financial mismanagement of certain funds at PCC. Plaintiff's speech may be described as that of a whistleblower who is deserving of greater protection under the First Amendment. *Conaway*, 853 F.2d at 797. The court is aware that the employer's burden of proving interference is less demanding when the employee is a high ranking official who serves in a confidential or policymaking role. *Hall*, 856 F.2d at 261. Defendant has not come forth with sufficient evidence of record to show that plaintiff's speech was a disruption to the college or had a disharmonious effect upon the efficient administration of the college.

In its reply brief, defendant contends plaintiff is unable to show that his financial criticisms were a substantial or motivating factor in the defendant's decision to reassign him or to not renew his contract. Circumstantial evidence is enough to present the issue of causation to the jury. *Ware*, 881 F.2d at 911. Although summary judgment is generally an inappropriate vehicle for addressing questions of motivation, a plaintiff cannot rest on his conclusory allegations of the defendant's retaliation against his protected speech. *Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d 1384, 1393 n. 12 (10th Cir.1988).

By analogizing the issue of causation to the more typical employment discrimination case of retaliation, an analytical framework is provided. The court considers whether the circumstantial evidence reasonably justifies an inference of a retaliatory motive, such as protected speech closely followed by adverse action. *See Love v. Re/Max of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984). The employer may rebut the employee's prima facie case by articulating a nondiscriminatory reason for its adverse action, and the employee may in turn show that reason to be pretextual. *Rode v. Dellarciprete*, 845 F.2d 1195, 1203 (3rd Cir.1988).

■■■■ It is appropriate for the court to decline ruling on the motivation factor, since the defendant did not raise the issue until its reply brief. Even if the court were to address it, questions of material fact remain. One Board member, James Van Blaricum, has testified by deposition that one reason for plaintiff's reassignment was the conflict between him, Mr. Stratford, and President Gwaltney over the financial mismanagement of the college. Plaintiff has also submitted memoranda from May and July of 1984 in which he challenged certain financial practices. The significance of the time separating the protected speech and the reassignment/nonrenewal diminishes in light of the above referenced testimony of Mr. Van Blaricum. Summary judgment is denied on plaintiff's claim that his reassignment and nonrenewal was in retaliation for his criticisms of financial mismanagement and wrongdoings at PCC.

■■■■ The court agrees with defendant that plaintiff's First Amendment claim for the right to petition for redress is vulnerable to summary judgment, because it does not rise to the level of public concern. In *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262–63 (7th Cir.1988), the court held that the plaintiff's threatened grievance must be worthy of First Amendment protection—satisfy the *Connick–Pickering* test—before any retaliatory action may be said to violate the right to petition clause. The Seventh Circuit decided that an appeal of plaintiff's employment grievance would have exposed an illegality in a position that the town board refused to reclassify. 858 F.2d at 1263.

This court has already decided that plaintiff's request for a due process hearing does not involve a matter of public concern. There is nothing illegal in the Board's decision to assign plaintiff new responsibilities. For the same reasons, plaintiff's signing of his employment contract under protest is also not an issue of public concern. These are merely matters of a personal employment grievance over reassignment, and plaintiff's general references to financial improprieties in the July 15th meeting or his intervening trip to Topeka do not transform his subsequent actions into those deserving a constitutional shield.

## DUE PROCESS

■■■■ The protection of procedural due process is not available until the plaintiff establishes the existence of a recognized property or liberty interest. *Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d at 1394. "[T]he range of interests protected by procedural due process is not infinite." *Bd. of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

### A. *Property Interest*

■■■■ Though protected by it, they are not creations of the Constitution; property interests emerge from separate sources such as state statutes, local ordinances, established rules, or mutually explicit understandings. *Perry v. Sindermann*, 408 U.S. 593, 601–602 n. 7, 92 S.Ct. 2694, 2699–2700 n. 7, 33 L.Ed.2d 570 (1972); *see also Dickeson v. Quarberg*, 844 F.2d 1435, 1437 (10th Cir.1988). A property interest is more than an "abstract need or desire" and more than a "unilateral expectation of it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. "The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *see also Setliff*, 850 F.2d at 1395.

■ The determination of whether an employee has a property interest in his continued employment is made in accordance with state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Historically, Kansas courts have followed the general rule that "in the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged." *Johnson v. National Beef Packing Co.,* 220 Kan. 52, 54, 551 P.2d 779 (1976). Since the *Johnson* decision, the Kansas Supreme court has retreated from the strict employment-at-will doctrine by expanding the concept of implied-in-fact employment contracts. *Morriss v. Coleman Co.,* 241 Kan. 501, 508–513, 738 P.2d 841 (1987). The circumstances relevant in determining whether an implied contract exists have been summarized as follows:

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

*Morriss,* 241 Kan. at 513, 738 P.2d 841 (quoting *Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984)). In summary, courts have recognized a property interest in employment under Kansas law when there is an express or implied contract either for a definite term or for continued employment absent good cause for termination. *See Conaway v. Smith,* 853 F.2d at 793–94; *Johnson v. City of Wichita,* 687 F.Supp. 1501, 1506–1508 (D.Kan.1988); *Staneart v. Bd. of Tr. of Ransom Memori-*

*al Hosp.,* 684 F.Supp. 1573, 1576–1578 (D.Kan.1988).

Plaintiff claims the following property interests: (1) implied contract in his position as Dean of Instruction; (2) implied contract for continued employment from year to year absent just cause for nonrenewal; and (3) express and/or implied contract for the 1985–1986 school year. Defendant challenges the sufficiency of all three claimed property interests.

### Dean of Instruction

Plaintiff bases his implied contract in this position on his nine years of service as Dean of Instruction, the Board's acceptance in March of 1985 of President Gwaltney's recommendation that plaintiff be reemployed, and his actual performance as Dean of Instruction from July 1, 1985, until his reassignment on July 15, 1985. Defendant aptly notes that the Board in March approved the recommendation of plaintiff's reemployment as only one of the administrative personnel without further specifying any particular position or title. Defendant also argues that plaintiff was told of President Gwaltney's recommendation for plaintiff's reassignment prior to July 15, 1985, thereby undermining any expectations created during that short period of performance in his former position.

■ Serial reemployment pursuant to one-year contracts does not establish a legitimate expectation in continued employment. *Martin v. Unified School Dist. No. 434, Osage Cty.,* 728 F.2d 453, 455 (10th Cir.1984); *see also Smith v. Board of Educ. of City of Chicago,* 853 F.2d 517, 521 (7th Cir.1988). Plaintiff has not come forth with sufficient evidence to raise a question of fact submissible to the jury on whether he has a property interest in the position as Dean of Instruction. Courts have been particularly reluctant to recognize a school employee's property interests in particular assignments. *See e.g. Maples v. Martin,* 858 F.2d 1546, 1550–51 (11th Cir.1988) ("Transfers and reassignments have generally not been held to implicate a property interest."); *Lagos v. Modesto City Schools Dist.,* 843 F.2d 347, 349–50 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct.

309, 102 L.Ed.2d 328 (1988); *Jett v. Dallas Independent School Dist.*, 798 F.2d 748, 754 (5th Cir.1986), *modified on other grounds,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff's 1984–1985 written contract expressly obligated him to perform such administrative services as the Board or its representatives "may direct." As there are no statutory or administrative standards governing the Board's assignment of administrative responsibilities, this is the type of administrative decision that should be left to the "unfettered discretion of university officials." *Roth*, 408 U.S. at 566–67, 92 S.Ct. at 2703–04.

Even assuming the plaintiff could show a property interest in his position of Dean of Instruction, the meeting between plaintiff and the Board on July 15th comports with the flexible demands of procedural due process. The extent of the necessary procedural protections is a function of circumstances, including "the nature of the individual interest at stake; the risk of erroneous deprivation and the probable value of additional safeguards; and the nature of the governmental interest involved." *Rosewitz v. Latting*, 689 F.2d 175, 177 (10th Cir.1982) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). The decision of whether to reassign an administrator new responsibilities is not in the nature of governmental action that demands the attachment of the full panoply of due process rights. Prior to the Board's decision, plaintiff was given the opportunity to express his opinion regarding the President's recommendation. Plaintiff has not explained how the opportunity to cross-examine or the presence of counsel would have changed the Board's decision to accept the change in administrative assignments. *See Meder v. City of Oklahoma City*, 869 F.2d 553, 555 (10th Cir.1989).

### Continued Year–To–Year Employment

Plaintiff insists this implied contract is sustained on the evidence that he was advised and generally understood from usage at PCC that his employment would continue assuming his successful performance and no just cause for nonrenewal, that PCC had an evaluation policy which stated that a contract would not be renewed on the basis of incompetence, and that his understanding of the evaluation practice came from his responsibility to evaluate those employees under him. Defendant challenges the factual basis of any alleged statements regarding continued employment or an evaluation policy for administrative employees at PCC.

Plaintiff avers that it was his understanding:

> that once it was initially determined that I was qualified and able to perform my assigned responsibilities as Dean of Instruction, that I would only be nonrenewed or terminated from my position for just cause. This was implied to me by things said and done by, among others, President Norman Myers, President John Gwaltney, and various members of the Board of Trustees.

The vague, incomplete and indefinite nature of this averment compels this court to treat whatever was said or done towards plaintiff to be little more than unofficial promises or a description of past practices. *See Lovelace v. Southeastern Massachusetts University*, 793 F.2d 419, 424 (1st Cir.1986); *Munson v. Friske*, 754 F.2d 683, 692 (7th Cir.1985). Plaintiff's evidence falls far short of showing a mutually explicit understanding of his continued employment.

Plaintiff has not submitted to the court any of the documents, which he argues, establish an evaluation policy for PCC administrators. Defendant has cogently shown the plaintiff's former position to have been excluded from its evaluation policy. In addition, Chief Judge O'Connor has rejected a property interest claim based solely on the terms of the Kansas Evaluation of Certificated Personnel Act, K.S.A. 72–9001 *et seq. Burk v. Unified School Dist. No. 329, Wabaunsee Cty.*, 646 F.Supp. 1557, 1562–1564 (D.Kan.1986). Plaintiff has not presented any evidence of a Board policy that a performance evaluation is the determining factor in the nonrenewal of an administrator's contract. *See Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1186 (11th Cir.1985).

Plaintiff's practice in evaluating those reporting to him does not reasonably sustain an inference that the same practices and standards would govern his employment. On this record, summary judgment is appropriate for defendant on this claimed property interest.

### 1985–1986 School Year

Plaintiff asserts both an express and implied contract for this school term. Defendant denies that either contract existed and thereby was breached by the nonrenewal of plaintiff's contract. The court will first consider whether an implied contract existed for the 1985–1986 school year. Since existence of either an express or implied contract is a necessary element to plaintiff's pendent state common-law claim for breach of contract, the parties' arguments under those sections of their briefs will also be addressed.

■ "Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally or explicitly stated in words." *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d 917 (1987). A mutual intent to contract must be shown by the facts and circumstances. *Id.* at 364, 736 P.2d 917. "In an implied contract, one or more of the terms and conditions are implied from the conduct of the parties." *Id.* at 363–64, 736 P.2d 917 (citing *Williams v. Jones*, 105 Kan. 282, 182 P. 391 (1919)).

■ Plaintiff claims an implied contract existed for the 1985–1986 term prior to the submission of the written contract to him on July 19, 1985, based upon the Board's vote for his reemployment in March 11, 1985, his prior service for nine years, the Board setting his salary at the meeting on July 15, 1985, and his performance on the job after the expiration of the 1984–1985 contract from July 1, 1985, until August 6, 1985. The court does not consider these circumstances sufficient to raise a question of material fact on whether an implied contract exists.

None of the Board's actions can reasonably be interpreted as constituting an offer to contract, nor can plaintiff's conduct be seen as any acceptance of an outstanding offer. The Board's actions at the meetings on March 11th and July 15th are nothing more than preliminary ministerial steps taken towards formalizing an offer of employment. An administrative board must be allowed the flexibility to plan its actions without binding itself to contracts allegedly implied from those same planning measures. Short of a formal or direct offer of employment, a board should not be contractually bound by preliminary votes only approving recommendations of reemployment.

Plaintiff's performance after July 1, 1985, simply does not raise a reasonable inference that it was in performance of a contract for a definite term of one year. At best, his actions and the Board's response evidence that they mutually anticipated an agreement would be reached for another one-year term. Plaintiff's past employment was pursuant to a series of written term contracts, and his understanding of that fact cannot be overemphasized. *See Lovelace v. Southeastern Massachusetts University*, 793 F.2d at 423 ("[W]hen there is a written system of which the employee is aware, it generally will not be reasonable for the employee to rely on employment assurances made outside of the formalized system."). Until the Board formally offered him a contract and he unconditionally accepted it, the practice of the parties over the last nine years, neither the Board nor the plaintiff could reasonably understand nor intend that a contract of employment for a one-year term existed.

The letter from the Board's attorney dated July 15, 1985, does not evidence defendant's understanding that a contract with plaintiff already existed. The Board made a number of inquiries to its attorney, including:

> You further inquired concerning whether an administrative employee would have a reasonable expectation of a constitutionally protected property interest of re-employment or continued employment and whether they would be entitled to a due process hearing....

> . . . .

> You have further made inquiry as to what process or procedure could be used

by the Board in the event there was a total lack of confidence in an administrative employee, whose contract had been renewed, and we have determined the options as being numerous.

(Gwaltney Depo. Ex. 27). This letter only shows that the Board's attorney was asked to consider several possible circumstances and to give a legal opinion on the Board's options under each hypothetical situation. Since both reemployment and termination were contemplated in the inquiries to the Board's attorney, an inference of the Board's understanding one way or the other on whether a contract existed with plaintiff cannot reasonably be made. Plaintiff has not raised a question of material fact concerning the existence of an implied contract for the 1985–1986 term.

 "An offer communicated to the offeree creates a power to accept that offer and only that offer." *Ferrero v. Amigo, Inc.,* 703 F.Supp. 890, 892 (D.Kan.1988). "Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract." *Steele v. Harrison,* 220 Kan. 422, 428, 552 P.2d 957 (1976). An ostensible acceptance which imposes a new or different term is not an unconditional acceptance, but it is a counteroffer. *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, 737, 512 P.2d 379 (1973). On the other hand, the Kansas Supreme Court has recognized:

> "It must not be inferred, from the rule that an acceptance must be unconditional, that the mere mention in a letter of acceptance of matters upon which the acceptance of the proposition does not depend prevents the contract from being completed. There is authority to the effect that although an acceptance which introduces a new term as part of the proposed contract is insufficient, the mere addition to the acceptance of a collateral or immaterial requisition not warranted by the terms of the offer does not prevent the contract from being completed. Thus, immaterial or minor differences or variances between the offer and acceptance will not prevent the formation of a contract...."

*Wallerius v. Hare,* 200 Kan. 578, 583, 438 P.2d 65 (1968) (quoting 17 Am.Jur.2d Contracts § 65). The existence of a contract is generally a question of fact. *Steele,* 220 Kan. at 429, 552 P.2d 957. Whether a written instrument or undisputed facts establish the existence and terms of a contract are, however, questions of law for the court. *Hays v. Underwood, Administrator,* 196 Kan. 265, 267, 411 P.2d 717 (1966).

Plaintiff argues that his intent in signing the contract under protest with the attached memorandum is the critical factual inquiry in determining that an agreement exists. Defendant counters that the significant inquiry is one of law regarding whether the written memorandum is a material alteration of the offer so as to constitute a counteroffer rather than an unconditional acceptance. The court agrees with defendant that the significance of plaintiff's written memorandum is one of law and that plaintiff's subjective intent is not determinative of the legal import of the unambiguous document.

Plaintiff characterizes his attached memorandum to be simply a "grumbling acceptance" and "a reference to his already existing First Amendment right to petition the government for due process." (Dk. 129, p. 77). Defendant reads more serious implications in his statements:

> Undoubtedly, plaintiff was not unconditionally accepting the offer of employment presented by defendants. In fact, plaintiff was making it clear that he would accept the contract only on his terms and such terms were that he was going to protest the change and new position to the extent that he hoped the school would be forced to reinstate the dean of instruction position and replace plaintiff as such dean.

(Dk. 120, pp. 20–21).

 The plaintiff's memorandum readily conveys two messages. First, plaintiff has signed the contract under protest as he considers the contract to have violated his perceived property interest in his position as Dean of Instruction. Second, plaintiff's execution of the contract is not to be considered as a waiver of his rights to retain

his former position or to contest his reassignment. The court considers the second message to be a material addition constituting a counteroffer.

In his attached memorandum, plaintiff does not state that he is simply reserving any constitutional, procedural or grievance rights he already has to contest the reassignment. Plaintiff makes no effort to delineate what rights he considers himself to have to contest any further the Board's decision to accept the recommendation for his reassignment. Literally, plaintiff is reserving the right to protest his reassignment at any time and in any manner and forum as he sees fit, regardless of the consequences to PCC. Plaintiff expressly conditioned his acceptance of the employment contract on the Board's further agreement that his acceptance would not constitute a waiver of his claim to continue to protest his reassignment pursuant to whatever rights that he believed he had and in whatever manner that he deemed necessary. As an employer, the Board could reasonably interpret plaintiff's written memorandum as a reservation of the right to be an obstreperous employee until returned to his former position as Dean of Instruction.

Plaintiff contends his situation closely resembles the case of *Price v. Okl. Col. of Osteopathic Med. & Surg.*, 733 P.2d 1357 (Okla.Ct.App.1986), in which the court held that the instructor's statement that he was signing under protest of the calculated salary did not qualify his acceptance of the college's appointment. This decision is distinguishable from the case *sub judice* on two important circumstances. Just above Dr. Price's signature on the acceptance, there appeared: "I accept the responsibilities of the appointment under the terms outlined above." Nothing found in the contract or memorandum signed by Dr. Hullman makes a similar unequivocal acceptance of the terms of the Board's offer. The Oklahoma court was satisfied that Dr. Price was merely expressing his opinion on whether his salary was determined in compliance with personnel policies. Dr. Hullman's "protest" does not end with his opinion, as he expressly reserves his rights, whatever they may be, to continue contesting the reassignment.

Plaintiff's reservation of rights is also not so narrowly drawn as to be simply an ineffective addition of words stating a condition that the law would imply anyway. Based in part upon the history of his conduct, as evidenced by, *inter alia*, his special request for a board meeting on July 15th and his statements therein, plaintiff did not consider, nor did he so state in his memorandum of protest, that his rights to contest the reassignment would be confined to structured grievance or judicial proceedings. The Board reasonably and properly understood plaintiff's acceptance to be conditioned upon his continued right to contest his reassignment by any means, including defiant conduct. For these reasons, the plaintiff lacks both a property interest and a breach of contract claim in his employment for the 1985–1986 school term.

### B. *Liberty Interest*

Notwithstanding the absence of a property interest, a procedural due process hearing may still be necessary if a liberty interest is implicated. *Rich v. Secretary of the Army*, 735 F.2d 1220, 1226 (10th Cir.1984). In a public employment setting, the concept of liberty encompasses two interests: "1) the protection of his good name, reputation, honor, and integrity, and 2) his freedom to take advantage of other employment opportunities." *Conaway*, 853 F.2d at 794 (quoting *Miller v. City of Mission, Kan.*, 705 F.2d 368 (10th Cir.1983)). The manner in which the employment is terminated may deprive the employee of one or both of the liberty interests. *Rich*, 735 F.2d at 1227. Injury to reputation alone will not suffice to trigger due process requirements unless entangled with the loss of a more tangible interest such as employment. *Setliff*, 850 F.2d at 1396. "For an employee to make a successful liberty deprivation claim, in addition to proving one of the above-recognized interests, he must also show that his dismissal resulted in the publication of information which was false *and* stigmatizing." *Conaway*, 853 F.2d at 794 (emphasis

in original) (citing *Sipes v. United States*, 744 F.2d 1418, 1421 (10th Cir.1984)).

 Plaintiff alleges his private and professional reputation was damaged by the posting of a security guard on August 6, 1985, the Board's statement in the minutes of the July 29th meeting that it heard Dr. Hullman's concerns during the July 15th meeting and found no grounds for disapproving President Gwaltney's recommendation, and the Board's press release that Dr. Hullman's counteroffer was refused as it was "deemed necessary to maintain control over the operations of the institution." None of these actions or statements reach the level necessary to implicate a liberty interest.

 Courts have held the following publicized reasons for dismissal do not deprive one of a liberty interest: incompetence, negligence, low productivity and dereliction, *Sullivan v. Stark*, 808 F.2d 737, 739 (10th Cir.1987); *Strizel v. United States Postal Service*, 602 F.2d 249, 252–53 (10th Cir.1979); *Simpkins v. Sandwich Community Hosp.*, 854 F.2d 215, 218 (7th Cir.1988); adversarial attitude and inability to get along with others, *Roley v. Pierce County Fire Protection Dist. No. 4*, 869 F.2d 491, 495 (9th Cir.1989); *Sullivan v. School Bd. of Pinellas County*, 773 F.2d at 1187. A liberty interest is not implicated merely because the circumstances may make the employee less attractive to employers or merely because the employee loses some economic returns or prestige. *Setliff*, 850 F.2d at 1396–97.

 Discharge under allegations of dishonesty, stealing, immorality or moral turpitude puts a liberty interest at issue. *Bailey v. Kirk*, 777 F.2d 567, 580 n. 18 (10th Cir.1985); *Sullivan v. School Bd. of Pinellas County*, 773 F.2d at 1187; *see also Burk*, 646 F.Supp. at 1566. An adverse charge is not stigmatizing unless it gives rise to "a 'badge of infamy,' public scorn, or the like." *Wells v. Hico Independent School Dist.*, 736 F.2d 243, 256 n. 16 (5th Cir.1984), *cert. dismissed*, 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985).

Stationing a security guard for one night in a college administrative building during a summer month is not an act that publi-cizes a stigmatizing reason for plaintiff's nonrenewal. Neither the Board's minutes nor the Board's press release damage plaintiff's reputation or impose a stigma to his employment opportunities. Plaintiff's liberty interest allegations fall far short of the threshold for a submissible claim to the jury.

### BREACH OF CONTRACT

The court adopts its discussion of plaintiff's asserted property interest in the 1985–1986 school term as its holding and reasoning on this claim.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is denied as to plaintiff's First Amendment claim on his criticisms and complaints of PCC's financial practices, and is granted on all of plaintiff's other claims.