# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 98-2527

No. 98-2528

_____

| | |
|---|---|
| Great Rivers Cooperative of Southeastern Iowa; Sawyer Cooperative Equity Exchange; and Roger Tacey, | * <br> * <br> * <br> * <br> * |
| Plaintiffs/Appellants/ Cross-Appellees, | * <br> * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   Southern District of Iowa |
| Farmland Industries, Inc.; Harry Cleberg; H. Wayne Rice; and Albert Shively | * <br> * <br> * <br> * |
| Defendants/Appellees/ Cross-Appellants. | * <br> * <br> * <br> * <br> * |
| _____ | * <br> * |
| National Council of Farmer Cooperatives | * <br> * <br> * |
| Amicus Curiae | * |

_____

Submitted: May 10, 1999

Filed: December 16, 1999

_____

Before LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and WATERS,[1] District Judge.

WATERS, District Judge.

In this class action, Great Rivers Cooperative of Southeastern Iowa, an Iowa farm cooperative, Sawyer Cooperative Equity Exchange, a Kansas farm cooperative, and Roger Tacey, a Nebraska resident and hog producer,[2] both individually and on behalf of the class, appeal the district court's[3] partial summary judgment orders rejecting their securities claims, their unjust enrichment claim, and a portion of their breach of fiduciary duty claims. Farmland Industries, Inc., a Kansas farm cooperative, Harry Cleberg, the Chief Executive Officer (CEO), President, and a director of Farmland, H. Wayne Rice, a former director of Farmland Foods (Foods) a subsidiary of Farmland, and Albert Shively, a director on, and the chair of, the Farmland's board of directors,[4] appeal from the district court's order certifying the class. Because we affirm the district court's summary judgment rulings, we find it unnecessary to reach the issues raised by the cross-appeal.

---

[1]The Honorable H. Franklin Waters, United States District Judge for the Western District of Arkansas, sitting by designation.

[2]Unless the facts or case law require otherwise, the court will collectively refer to the appellants/cross-appellees as the class.

[3]The Honorable Harold D. Vietor, Senior United States District Judge for the Southern District of Iowa.

[4]Unless the facts or case law require otherwise, the court will collectively refer to appellees/cross-appellants as Farmland.

# I.  A Jurisdictional Issue

We have jurisdiction over final orders and certain types of interlocutory orders. See 28 U.S.C. §§ 1291, 1292.  In general, a pretrial order dismissing less than all of a plaintiff's claims is interlocutory and cannot be appealed unless it includes the grant or denial of an injunction, see § 1292(a)(1); or the district court has certified a controlling issue of law under 28 U.S.C. § 1292(b); or the court has directed entry of a partial final judgment with the determination required by Rule 54(b) of the Federal Rules of Civil Procedure; or the interlocutory order is appealable under the narrow, judicially created "collateral order" doctrine.

In this case, after certifying a class, the district court ordered partial summary judgment dismissing the class's claims under Rule 10b-5 and § 12(2) of the federal securities laws, and nearly all of its breach of fiduciary duty and unjust enrichment claims under state law.  The court left unresolved the class' federal law claims under RICO, § 14(e) of the Securities Exchange Act of 1934, and the Agricultural Fair Practices Act of 1967, plus state law claims against defendant Rice arising out of one transaction.  Though the two summary judgment orders were interlocutory, at the class' request the district court both directed the entry of judgment pursuant to a Rule 54(b) determination there was no just reason for delay, and certified its rulings as controlling issues of law under 28 U.S.C. § 1292(b).  The class then appealed, but we declined to exercise our discretion to permit a § 1292(b) appeal, rejected the district court's Rule 54(b) determination, and dismissed the appeals for lack of a final order. See Great Rivers Coop. of S.E. Iowa v. Farmland Ind., Inc., No. 97-8119 (8th Cir. June 25, 1997), and Nos. 97-2904 & 97-2906 (8th Cir. Aug. 21, 1997).

Returning to the district court, the class moved for dismissal of its remaining claims without prejudice under Rule 41(a)(2), explaining that its purpose was to "remove this obstacle" to immediate appellate review of the prior dismissal of its other claims.  A notice, approved by the court, was sent to the class advising that the motion

to dismiss had been filed "to facilitate appellate review" of the prior dismissals, and that the claims to be voluntarily dismissed could be reinstated if the appeal was successful. After giving the class an opportunity to comment, the district court granted the dismissal motion over Farmland's objection. The Clerk filed a separate judgment document. See Fed. R. Civ. P. 58. That document concluded, "Based on the foregoing and the prior rulings of the court, Plaintiffs' fourth amended complaint now stands DISMISSED in its entirety." The class then commenced these appeals.

Farmland argues we lack appellate jurisdiction because "plaintiffs cannot manufacture appellate jurisdiction over interlocutory orders . . . simply by dismissing temporarily" their remaining claims without prejudice. Our prior dismissals established that the district court's partial summary judgment rulings were non-appealable until the case had proceeded to final judgment. Thus, there can be little doubt that basing this appeal on a disingenuous voluntary dismissal was contrary to the strong policy that parties must "raise all claims of error in a single appeal following final judgment on the merits." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374, 101 S. Ct. 669, 66 L. Ed. 2d 571 (1981). A plaintiff whose strongest claims have been dismissed in an interlocutory order may expedite appeal by dismissing its remaining claims *with prejudice.* But a dismissal without prejudice, coupled with the intent to refile the voluntarily dismissed claims after an appeal of the interlocutory order, is a clear evasion of the judicial and statutory limits on appellate jurisdiction.

Some district courts, frustrated by appellate court resistance to Rule 54(b) determinations and § 1292(b) certifications, have been willing to assist efforts to create apparent but illusory final orders. See, e.g., Horwitz v. Alloy Automotive Co., 957 F.2d 1431, 1432-33 (7th Cir. 1992). But the circuit courts are understandably and uniformly hostile to these tactics. Many circuits have dismissed such appeals for lack of jurisdiction, concluding that, in the absence of a Rule 54(b) determination, a voluntary dismissal without prejudice is not a final judgment because the dismissed claims can be later revived. See Chappelle v. Beacon Commun. Corp., 84 F.3d 652,

654 (2d Cir. 1996); Mesa v. United States, 61 F.3d 20, 21 (11th Cir. 1995); Cook v. Rocky Mountain Bank Note Co., 974 F.2d 147, 148 (10th Cir. 1992); Cheng v. Commissioner, 878 F.2d 306, 309-11 (9th Cir. 1989); Ryan v. Occidental Pet. Corp., 577 F.2d 298, 303 (5th Cir. 1978). Farmland urges us to follow those decisions and dismiss these appeals. Our problem is that these decisions ignore the well-established test for determining whether a district court judgment that seemingly ends the case is an appealable "final decision" within the meaning of 28 U.S.C. § 1291.

A dismissal without prejudice can be an appealable final order. See United States v. Wallace & Tiernan Co., 336 U.S. 793, 794 n.1, 69 S. Ct. 824, 93 L. Ed. 1042 (1949); United States v. National City Lines, Inc., 334 U.S. 573, 577, 68 S. Ct. 1169, 92 L. Ed. 1584 (1948). "To be a final order or judgment, there must be 'some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned, is the end of the case.'" Goodwin v. United States, 67 F.3d 149, 151 (8th Cir. 1995), quoting Fiataruolo v. United States, 8 F.3d 930, 937 (2d Cir. 1993). Here, we have the requisite "clear and unequivocal manifestation" -- a final judgment of the district court dismissing the class's complaint "in its entirety." That is a final decision, and while we have no more desire to permit "manufactured interlocutory appeals" than our sister circuits, we find no authority in § 1291 to decide that some "final decisions" are appealable but others are not. Thus, in our view, the question whether parties will be permitted to "manufacture" appeals in this fashion is not jurisdictional, as we observed without discussing the issue in Chrysler Motors Corp. v. Thomas Auto Co., 939 F.2d 538, 540 (8th Cir. 1991).

Concluding that we have appellate jurisdiction does not leave us defenseless against this kind of accelerated interlocutory appeal. In Chrysler, the parties jointly stipulated to the dismissal without prejudice under Fed. R. Civ. P. 41(a)(1)(ii), a form of dismissal that is an "unconditional right" of the parties "which contains no exceptions that call for the exercise of judicial discretion by any court." See Gardiner v. A.H. Robins Co., Inc., 747 F.2d 1180, 1190 (8th Cir. 1984). Here, on the other

hand, the class moved to dismiss its remaining claims without prejudice under Rule 41(a)(2). "It is axiomatic that a dismissal pursuant to Rule 41(a)(2) is not one of right but is rather a matter for the discretion of the trial court." United States v. Gunc, 435 F.2d 465, 467 (8th Cir. 1970). Thus, what Farmland presents as a jurisdictional issue is in fact the question whether the district court abused its discretion when it dismissed the remaining claims without prejudice for the purpose of allowing the class to appeal the court's interlocutory summary judgment orders. See, e.g., Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 951 (8th Cir. 1999) (affirming discretionary denial of Rule 41(a)(2) voluntary dismissal).[5]

This Rule 41(a)(2) issue arises in a number of different contexts that may call for different responses. For example, in rejecting the jurisdictional challenge in Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1106 (8th Cir.), cert. denied, 119 S. Ct. 2400 (1999), we noted that a dismissal without prejudice of additional defendants does not do the same violence to the policy against piecemeal appeals as a dismissal without prejudice of remaining claims against the same defendants. In most cases, however, a district court does abuse its discretion when it frustrates the limitations on federal appellate jurisdiction by entering a Rule 41(a)(2) order dismissing remaining claims without prejudice for the purpose of facilitating the immediate appeal of an earlier interlocutory order. Certainly in this case, after we dismissed the initial appeals of the district court's interlocutory summary judgment orders, granting the class's Rule 41(a)(2) motion was a clear abuse of discretion.

---

[5]As Chrysler illustrates, the prevailing party to a significant interlocutory ruling may sometimes be willing to help create a bogus appearance of finality by stipulation. In the future, parties in this circuit who may be tempted to use a Rule 41(a)(1)(ii) stipulation to appeal an earlier interlocutory order should beware of the well-recognized limits on appellate review of such stipulations, an issue we did not address in Chrysler. See 8 MOORE'S FEDERAL PRACTICE § 41.34[7]; see also Empire Volkswagen Inc. v. World-Wide Volkswagen Corp., 814 F.2d 90, 94-95 (2d Cir. 1987).

There remains a difficult question of remedy. In most cases, the proper remedy will be to reverse the Rule 41(a)(2) order and remand for completion of the case, without considering the merits of the earlier interlocutory order(s). But that is not the only alternative. In Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1245 (8th Cir. 1994), for example, we deemed an ambiguous voluntary dismissal of remaining claims to be *with prejudice* and went on to consider an appeal from the district court's earlier grant of partial summary judgment. Unfortunately, that is not an option in this case because the district court's Rule 41(a)(2) dismissal order was premised upon a notice to the class that the dismissal would be without prejudice, and it would be unfair to absent class members for us to rule otherwise. We nonetheless recognize that the parties and the district court went to great lengths to create a final order, including notice to the class, and the parties have fully briefed and argued the merits of summary judgment orders entered nearly three years ago. Though we strongly disapprove of this use of a dismissal without prejudice to create what is in substance an impermissible interlocutory appeal, our prior case law did not foreclose that effort here. In this unique procedural posture, we conclude that fairness to the certified class of plaintiffs justifies our reaching the merits of their appeal. As the question is one of discretion, not jurisdiction, we will do so.

## II. The Facts

We review a district court's grant of summary judgment de novo applying the same standard used by the district court. Lynn v. Deaconess Med. Center-West Campus, 160 F.3d 484, 486 (8th Cir. 1998). "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. See also Blaske v. UNUM Life Ins. Co. of America, 131 F.3d 763, 764 (8th Cir. 1997)(We will affirm the district court only if we find that no genuine issue of material fact exists and that Farmland is entitled to

judgment as a matter of law), <u>cert. denied</u>, ___ U.S. ___, 119 S. Ct. 44, 142 L. Ed. 2d 34 (1998).

The facts of this case are extensive and complex and the court finds it necessary to recite them in some detail to, hopefully, define and explain the issues the court now must decide. Farmland is a regional agricultural cooperative organized under the laws of Kansas. Through the combined market power of its membership, the cooperative places individual farmers in a better bargaining position in the sale of their products and seeks to provide products and services at cost.

Under the Kansas Cooperative Marketing Act, the owners of a cooperative's voting common stock must be "persons engaged in the production of agricultural products." Kan. Stat. Ann. § 17-1606(a). "Membership in Farmland is limited to agricultural producers and associations of such producers maintaining a minimum investment of $1,000 in par value of Common Stock." Class (hereinafter Cl.) Appendix, at 293-94.

Farmland enters into patronage agreements with each of its members "regarding the calculation and distribution of patronage refunds." <u>Id.</u>, at 294. Additionally, Farmland enters into patronage agreements "with persons (hereinafter referred to as 'patrons') who meet the qualifications to be members or associate members but have not yet requested admission as such or who meet the qualifications to be members except the requirement to hold a minimum equity investment of $1,000 in par value of Farmland common stock (a 'growing member')." <u>Id.</u>

Farmland operates on a cooperative basis distributing to its members and patrons, in accordance with its patronage agreements, part or all of its net annual income resulting from transactions with its members and patrons. <u>Id.</u> These distributions are referred to as patronage refunds or patronage dividends. The amount of the refund is "based on the cooperative's annual net income multiplied by a fraction,

the numerator of which is the quantity or value of business done by the member with the cooperative in the period and the denominator of which is the quantity or value of business done by all members with the cooperative during the period." Id.

Farmland "generates margins" on transactions with nonmembers that are reflected as profit. Cl. Appendix, at 852. These earnings or profits are placed in a "surplus account that is available to drive down the equity requirements of the members to sustain and rejuvenate the business." Id. Distribution of these earnings is "at the full and complete discretion of the board." Id.

Usually, a portion of the patronage refund is distributed in cash and the balance is distributed in common stock or associate member common stock to members and associate members, or in capital credits to patrons. Cl. Appendix, at 295. The Farmland Board of directors annually determines the cash and non-cash portions of the patronage refund. Id.

As of December of 1979, Article V of Farmland's Articles of incorporation provided in relevant part as follows:

> The capital stock of this Association shall be $750,000,000.00, consisting of 20,000,000 shares of common stock of the par value of $25.00 per share, 2,000,000 shares of associate member common stock of the par value of $25.00 per share and 8,000,000 shares of preferred stock of the par value of $25.00 per share.

Article II of Farmland's Bylaws provided for the distribution of fiscal year net savings. According to this article, savings from marketing operations and the savings from purchasing and service operations would be apportioned and distributed first as a limited amount of dividends on outstanding preferred stock. Next, amounts attributable to nonmember patronage and nonpatronage transactions were set aside in

a surplus account.  The remaining savings were to be apportioned and distributed in the following manner:

> From the remaining net savings of each of the said divisions there shall be deducted the portion thereof attributable to patronage transactions with members and associate members of the Association.  Such amount, in each instance, shall be apportioned among the member patrons of the appropriate division upon any equitable patronage basis or bases approved by the board of directors and paid to them not less than twenty percent (20%) in cash and the balance in common stock to members and associate member common stock to associate members, at par value, as determined by the board of directors . . . .

Because of the statutory limitations on the type of person who could hold voting common stock, Farmland in 1980 decided it was necessary to create a new class of equity.  In a "Special Report to the Board of Directors on the Amendment of Farmland's Articles of Incorporation," it is stated:

> [T]he Articles provide for two classes of members -- holders of common stock and holders of associate member common stock.

> Associate membership is offered to cooperatives that may not qualify as voting members but do pay refunds and operate on a cooperative basis (or prefer to be an associate member because of other affiliations).

> We have a need for a third class of equity and we are proposing that it be entitled, "Capital Credits."

> The reason for this proposal is that we have had cases where cooperatives changed to a noncooperative, or where a cooperative

falsified its membership applications and was later discovered not to be a cooperative.

Because of theses circumstances we are reluctant to pay off their equities in cash, and would prefer to transfer their equities from the present two classes of equities mentioned above. Therefore, our proposal is to transfer their equities to "Capital Credits," and let them remain there until such time as it is appropriate to redeem them.

Cl. Appendix, at 102.

At a December 5, 1980, shareholders' meeting, new sections to Farmland's Articles of incorporation were adopted. One new section, regarding capital credits, read as follows:

Section 5. Capital Credits. The Association may issue at any time, and record on its books and records, capital credits in the Association. . . . Holders of Capital Credits shall not be entitled to vote. The Board of Directors may at any time or times authorize the retirement of any capital credits, in whole or in part, including but not limited to the retirement of capital credits to facilitate an association's retirement of the equities of its deceased or retired members. No interest shall be paid on outstanding capital credits. This Association shall have a lien on (and right of setoff against) all capital credits for all indebtedness of the holder(s), whether due or to become due, thereof to the Association.* * *

Cl. Appendix, at 108.

At the same time, the members voted to modify sections 2 and 3 of Article VI. Under the amendments, if an equity holder no longer qualified to hold common or

associate member common stock, the Board, "at its option," could either redeem the member's equity or convert it into capital credits in an equivalent amount. Cl. Appendix, at 106.

Capital credits were first issued in 1982 to dissolved or liquidated cooperatives in exchange for their Farmland common stock. Cl. Appendix, at 821. The dissolved or liquidated cooperatives are ineligible to hold common stock with its attendant voting rights. Id. These particular credits were designated by Farmland as Type 5 or "Series of Ten" capital credits.

In 1983, the Board of directors authorized the issuance of Type 4 capital credits to a local cooperative in Lebo, Kansas. Cl. Appendix, at 821. In 1989, Type 4 capital credits were issued to a local cooperative in Van Buren, Arkansas. Id. By contractual agreement, Type 4 capital credits are payable upon the dissolution of Farmland. Id. No other Type 4 capital credits have been issued.

In 1990, Farmland implemented a business plan called the base capital plan ("BCP"). As part of the BCP, Farmland planned to purchase the outstanding equity of its wholly owned subsidiary, Foods, with newly created Type 12 capital credits. Farmland distributed a letter discussing the BCP and held informational meetings. See Great Rivers II, 120 F.3d at 894. Portions of Farmland's Articles of incorporation relating to capital credits were amended. Specifically, section 5 was amended to make the capital credits transferable with the consent of the Board. The section read as follows:

Section 5. Capital Credits. The Association may issue at any time, and record **or transfer** on its books and records, capital credits in the Association. . . . Holders of Capital Credits shall not be entitled to vote. **The capital credits of this Association may be transferred, and common stock and associate member common stock may be**

–12–

**converted to capital credits and transferred, only with the consent of the Board of Directors of the Association and on the books of the Association.** The Board of Directors may at any time or times authorize the **transfer or** retirement of any capital credits. . . .

Cl. Appendix, at 166 (bold language represents portions that were added).

In late November, 1990, Farmland's general counsel sent the board of directors background materials relating to the upcoming December 5, 1990, meeting, including a resolution authorizing the issuance of capital credits and explaining the terms under which the capital credits could be converted into common stock. Specifically, the correspondence stated that:

> Farmland's Capital Credits constitute a "right to purchase" Common Stock of Farmland within the meaning of K.S.A. Section 17-6407. Accordingly, Farmland's Articles of Incorporation will not need to be amended to specify the amount of Capital Credits that Farmland is authorized to issue. As "rights to purchase" Common Stock, Capital Credits are not "stock" and would likely enjoy a payment preference in the event of liquidation or dissolution of Farmland, limited to the actual dollar amount of Capital Credits outstanding. The statute requires that the rights inherent in the Capital Credits be evidenced by a certificate. Additionally, resolutions of the Board of Directors are required authorizing the issuance of capital credits and stating the terms and conditions upon which the Capital Credits may be converted into Common Stock and the duration of such rights. The proposed resolutions address these statutory requirements in the Capital Credits.

Cl. Appendix, at 195.

At the December 5-6, 1990, meeting, the board passed the following resolution:

> RESOLVED, that the president and secretary of the Association be, and they hereby are, authorized to issue up to $75,000,000 of Capital Credits to the members and patrons of the Association in accordance with the Articles of Incorporation and Bylaws, which Capital Credits shall be evidenced by the form of Certificate of Capital Credits previously approved by the Board of Directors together with a copy of these resolutions which shall be attached thereto and incorporated by reference therein.

Cl. Appendix, at 264.

As distinguished from "Series of 10" capital credits issued previously in 1982 (which were only issued to dissolved or liquidated cooperatives), these capital credits, referred to as "Type 12" capital credits, were given to:

> local associations and producers who ceased doing business with Farmland, or to producers who did not hold a sufficient amount of equity to qualify for membership in Farmland or who may hold sufficient equity but have not applied for membership. Formerly active members in Farmland who fail to do business with Farmland for a period of more than two years become ineligible for full voting membership. Farmland's Board of Directors authorizes the issuance of Type 12 Capital Credits to such cooperatives at the time the local associations or producers become ineligible.

Cl. Appendix, at 821.

Thus, Type 12 capital credits were issued to cooperatives or producers who ceased doing business with Farmland but had not dissolved. Farmland's underlying reasoning for this distinction between inactive cooperatives or producers and dissolved cooperatives or producers was that it:

> could not be in a position where we were rapidly redeeming equity in that situation, because that would encourage cooperatives to stop doing business with Farmland wholesale, completely with an eye toward getting immediate or quick cash redemption at which point they would be free again to begin doing business with Farmland. And we didn't want to be in a position where our equity management could be manipulated with that kind of practice. It would, No. 1, go a long way toward destroying Farmland just with respect to business volume, but then also with respect to having adequate capitalization.

Cl. Appendix, at 906.

In 1991, Tacey received his Type 12 capital credits in exchange for his Foods equity. In making the exchange,

> Tacey relied on Farmland's representations that (1) within one to two years of August 1991, the owners of the capital credits would be able to recoup their investment, either through redemption or by sale in a secondary market to be created by Farmland; (2) the value of the capital credits would be similar to the equity the offerees already held in Foods; and (3) the face value of the capital credits would be equal to the redemption value or the secondary market value.

Great Rivers II, 120 F.3d at 895.

–15–

On July 10, 1991, Farmland's counsel sent a letter to the Securities and Exchange Commission (SEC) requesting that it concur with Farmland's view that it could establish and operate a limited information system to facilitate the purchase and sale of its various forms of equity including capital credits among members, patrons, and holders of capital credits without registering as an investment adviser, a securities information processor, etc. Cl. Appendix, at 292-310. The information system would "take the form of a network of personal computers currently available to 36% of Farmland's members. Information will be distributed in written form to the remaining participants." Id., at 293.

The letter noted that under the articles of incorporation common stock, associate member common stock, and capital credits were each convertible into the other on an equivalent par value or face amount basis by members who meet the requirements to own the resulting security. Cl. Appendix, at 297. Capital credits, which were described as nonvoting, non-interest bearing, and receiving no dividends, were issued to patrons as the non-cash portion of a patronage refund and to reflect a change in status. Id. at 296. "Capital Credits have no preemptive rights, no sinking fund provisions and are not liable to further calls or assessments." Id. The letter stated that "[a]lthough Capital Credits are subject to redemption at the discretion of the members or the Board of Directors of Farmland to the extent funds are available therefor, it is expected that any funds available for redemption will be utilized to redeem Common Stock and Associate Member Common Stock under the base capital plan." Id. at 296.

In 1991, Farmland registered the capital credits with the SEC. On August 1, 1991, Farmland distributed to its equity holders a prospectus dated June 19, 1991, describing the implementation of the BCP and the information system. In an accompanying letter, Farmland stated:

The registration of [Farmland] Common Stock, Associate Member Common Stock and Capital Credits has been completed. These

–16–

securities have been registered with the [SEC] and various state securities authorities so that holders . . . may freely resell any of these securities . . . . Farmland expects that as a result of the implementation of the base capital certain holders of Farmland equity securities may desire to increase their investment in Farmland through the purchase of additional Common Stock, Associate Member Common Stock or Capital Credits. As discussed in the enclosed prospectus, each type of these securities is convertible one into the other.

Farmland's articles of incorporation state that "[i]n the event the Board of Directors of [Farmland] shall find, following a hearing, that any holder of the common stock of [Farmland] does not meet the qualifications as may be established by the Board of Directors for holders thereof . . . [Farmland] shall have the right . . . in exchange for such common stock . . . to issue or record on the books of [Farmland], capital credits in an equivalent amount." In practice, the decision to convert common stock to capital credits was made in the following manner: (1) the board would receive and consider a list of non-qualifying members; (2) individual board members had an opportunity to seek additional information, make comments, and discuss the identified non-qualifying cooperatives or producers; and (3) the board would vote on the conversion. The non-qualifying cooperatives or producers were not given notice of the board's intended action.

In its October 30, 1991, meeting, the board, consisting of twenty-two directors, converted over $8.7 million of common stock held by cooperatives who did not conduct business with Farmland during the 1991 fiscal year into capital credits. Both Cleberg and Shively were present at these meetings, voted for the conversions, and approved the minutes of the meetings.

Great Rivers and Sawyer received their credits through this conversion. Great Rivers and Sawyer had received the common stock as the retained portion of those

cooperatives' patronage refunds. Additionally, Sawyer received approximately half of its capital credits in exchange for equity it held in an Oklahoma cooperative, Union Equity Co-Operative Exchange, after Farmland acquired its assets in 1992.

The class contends Farmland has an obligation to redeem capital credits when financially able. Further, the class argues cooperative principles require Farmland to redeem the equity of inactive or dissolved members. Despite this obligation, the class contends various internal Farmland memoranda contain many statements on the issue of equity redemption which illustrate Farmland has no plan or intent to redeem the equity and establish Farmland knew the capital credits were worthless when they were issued. By way of example, the class points to the following statements:

BCP does not provide for any value to inactive members – assumes that they can receive cash by liquidating their equity holdings in a secondary market. * * * No secondary market exists and its implementation is unknown. (Cl. Appendix, at 318-19).

Although Capital Credits are subject to redemption at the discretion of the members or the Board of Directors of Farmland to the extent funds are available therefor, it is expressed that any funds available for redemptions will be utilized to redeem common stock and associate member common stock . (Cl. Appendix, at 296).

No program currently exists which gives inactive members an opportunity to receive par value for equities. (Cl. Appendix, at 93).

No provision will be made for the redemption of Farmland Industries' Capital Credits issued to associations other than Capital Credits issued in "Series of 10." (Cl. Appendix, at 99).

Capital credits are not currently covered under any equity redemption program. (Cl. Appendix, at 771).

In an undated "Outline of Equity Management Plan," Farmland stated that:

[n]o provision will be made for the redemption of Farmland Industries' Capital Credits issued to associations other than Capital Credits issued in series of 10. These ineligible capital credits are issued to existing and operating associations which no longer meet Farmland membership requirements due to insufficient equity investment and/or lack of business with Farmland.

Despite these statements, Farmland between 1988 and 1995 redeemed $6,881,414 of the Type 12 capital credits. Farmland (hereinafter Fml'd) Appendix, at 676. Interestingly, a portion of Great Rivers' equity, Type 12 capital credits, was redeemed in 1991 and 1992. Id., at 672.

In August of 1993, Great Rivers sold its assets to Double Circle Farm Supply. Prior to this sale, Great Rivers contends they were told by a Farmland employee that Great Rivers' equity would be redeemed within the year following the final sale of assets, provided Farmland was financially able.

At the November 30, 1993, shareholders' meeting an amendment to the capital credits section of the articles was adopted which specifically provided for the creation of "one or more classes of" capital credits that would allow for the different types of capital credits for different purposes. According to the class, the shareholders were not told that different classes of capital credits had already been created and that the different types of credits would have a different schedule for redemption. The articles were also amended to delete the provision requiring a hearing for conversion of common stock into capital credits as the board did not have "hearings" as such.

–19–

At an April 20, 1994, board meeting, an equity redemption plan (the Plan), designated as Secretary's Document No. 390, was adopted. The document provides:

> This Equity Redemption Plan was prepared in accordance with directives from the Board of Directors or [Farmland]. The adoption of this plan does not obligate the Board of Directors to follow the plan nor does it delegate authority to management to redeem equities based upon the plan. Management will use this plan to facilitate financial planning, to communicate the general intent of the Board of Directors with respect to redemption of equities and to develop proposals for the redemption of equities for Board consideration. The Board of Directors retains their discretionary authority to redeem the equities of the Association at such time and under such conditions as they deem to be in the best interest of the Association. The Board may from time to time redeem or not redeem equities in line with this plan.

According to the Plan, redemptions were to be made first pursuant to the base capital program, then for estate settlement, and finally for a category identified as special redemptions. The base capital program portion of the Plan provided for the redemption of the common stock and associate member common stock held by active members and associate members. The estate settlement portion of the plan called for the redemption at par value, with certain limitations, of the equity holdings of a deceased equity holder. The special redemptions portion of the plan called for redemptions on a prioritized basis subject to the financial position of Farmland.

The special redemptions portion of the Plan prioritized twelve categories of equity holdings. In October of 1994, the Board passed a resolution providing for the redemption of the first three categories of special redemptions and for a portion of the fourth category. Three of these four categories applied only to Series of Ten capital

credits. In October of 1995, the Board authorized redemption of certain capital credits and adopted a new equity redemption plan.

Farmland asserts it often disclosed, and Great Rivers itself understood, that capital credit redemption was discretionary. In addition, Farmland asserts that it has redeemed capital credits of liquidated and inactive cooperatives, like Great Rivers, before and throughout this litigation. Farmland points out that the class has successfully moved – twice – to stop capital credit redemptions during this litigation.

In July of 1992, a complaint was filed against Farmland in the United States District Court for the District of Colorado. Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., No. 92-K-1394 (D. Colo.) ("Consumers"). This class action involved small, liquidated cooperatives that had exchanged common stock for capital credits and allegedly later discovered that Farmland would not redeem the credits. See generally Great Rivers II, 120 F.3d at 895. The Consumers plaintiffs claimed Farmland had engaged in "freeze-out" schemes. They alleged RICO violations, securities fraud, breach of fiduciary duties, and unjust enrichment.

The Consumers case was settled in 1993. In mid-1994, Tacey, after learning of the Consumers suit, contacted a Farmland representative about redeeming his Type 12 capital credits. See Great Rivers II, 120 F.3d at 895. Tacey learned that Farmland would redeem the credits for not more than three cents on the dollar and that the promised secondary market was a failure. See Great Rivers II, 120 F.3d at 895.

Thereafter, Tacey filed this class action. The district court defined the class as follows:

> Local cooperatives, individuals, persons, and other entities who, between January 1, 1991 and July 29, 1994, held a legal, equitable, or beneficial interest in Farmland's unpaid profits and equity represented by capital

credits type 12. Excluded from the class are cooperatives and individuals who (i) participated as class members in the Consumers Gas and Oil v. Farmland lawsuit; (ii) opted out of participation as a class member in Consumers; or (iii) as an officer, director, or employee of Farmland participated in or wrongfully benefitted from the alleged fraudulent conduct.

Farmland subsequently moved for summary judgment against Tacey on the basis of time bar. The district court granted the motion as to the securities fraud claims finding that as a matter of law, Tacey had inquiry notice of Farmland's alleged misrepresentations more than one year before he filed his claims. We affirmed. See Great Rivers II, 120 F.3d at 899.

On March 12, 1997, the district court granted Farmland's motion for summary judgment on the class' unjust enrichment claim and granted the motion on the class' breach of fiduciary duty claims against Farmland, Rice (with the exception of the breach of fiduciary duty claims stemming from the Foods equity exchange), Cleberg, and Shivley. On May 5, 1997, the district court granted Farmland's motion for summary judgment on Great Rivers' and Sawyers' federal securities claims on the ground that the capital credits are not "securities" within the meaning of the federal securities laws. The class appeals the district court's summary judgment rulings.

### III. The Securities Claims

To invoke the protections of the securities laws, the class must show, or create a genuine issue of material fact as to whether, the capital credits are securities. The class first points out that until this suit was filed Farmland treated Type 12 capital credits as securities, i.e., it registered the credits as securities with the SEC and in various states, emphasized their transferability, referred to them as securities, and

–22–

openly described the equity as the provision of risk capital through the passive accumulation of equities.

The class contends that the capital credits fall within four categories of instruments that are securities under the plain language of the federal securities definition. Specifically, the class asserts that capital credits are: rights to purchase stock, certificates of interest or participation in a profit sharing agreement, transferable shares, or evidence of indebtedness.

The class argues the capital credits are securities under the "family resemblance" test set forth by the Supreme Court in Reves v. Ernst & Young, 494 U.S. 56, 61, 110 S. Ct. 945, 949, 108 L. Ed. 2d 47 (1990) or the investment contracts test set forth in S.E.C. v. W.J. Howey Co., 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). It points to the following characteristics of the capital credits which it believes demonstrate that the credits are "securities:" (1) the capital credits are transferable; (2) the capital credits represent retained equities and are issued by Farmland in an effort to raise, or retain, capital; (3) members gave value for the capital credits either in the form of equities given up or in the form of a deferred-cash, dollar-valued entitlement that the capital credits represent; (4) capital credit holders expect and receive distribution of Farmland's earnings; (5)Farmland profits that benefit equity holders, including capital credit holders, are derived from the managerial efforts of others; (6) capital credits give the owner the right to purchase common stock of Farmland; (7) capital credits evidence Farmland's retention of monies ultimately owed by Farmland to the member – which is a debt; and (8) a majority of the capital credit holders had the credits because their common stock had been converted to capital credits. Additionally, the class points out there is no other regulatory scheme that protects holders of capital credits, other than the federal security laws.

A cause of action falls under the 1933 Securities Act and the 1934 Securities Exchange Act only if the interest involved constitutes a "security." 15 U.S.C. §

–23–

77b(a)(1); 15 U.S.C. § 78c(a)(10).  Although there are slight differences in the way the two acts define the term "security," the two definitions are considered to be virtually identical.  E.g., Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n. 1, 105 S. Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985).

The Securities Exchange Act defines "security" as follows:

The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any interest or instrument commonly known as a "security";  or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing....

15 U.S.C. § 78c(a)(10).

Congress broadly defined the term security "so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847-48, 95 S. Ct. 2051, 2058-2059, 44 L. Ed. 2d 621 (1975)(quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)).  "Congress therefore did not attempt precisely to cabin the scope of the Securities Acts.  Rather, it enacted a definition of

'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." Reves, 494 U.S. at 61, 110 S. Ct. at 949.

Nevertheless, "Congress did not . . . 'intend to provide a broad federal remedy for all fraud.'" Id. (quoting Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S. Ct. 1220, 1223, 71 L. Ed. 2d 409 (1982)). Ultimately, the federal courts must "'decide which of the myriad financial transactions in our society come within the coverage of these statutes.'" Reves, 409 U.S. at 61, 110 S. Ct. at 949 (quoting Forman, 421 U.S. at 848, 95 S. Ct. at 2059).

The class points out Farmland's own legal counsel described the capital credits as "rights to purchase" stock. As the stock is in the class' view a security, the class argues the capital credits which can be exercised to acquire the stock are also securities. In opposition, Farmland argues the securities laws do not apply to stock that reflects cooperative membership capital contributions for membership participation rights.

Notwithstanding the fact that Farmland registered these instruments as securities, a registration it states was made out of caution, we agree that the characterization of the capital credits as "rights to purchase" stock did not transform the capital credits into securities. The fact remains that the exercise of this right to purchase is dependent on the holders' qualification for membership in the cooperative. As is discussed more fully below, the capital credits lack the essential characteristics of securities. United Housing Foundation , Inc. v. Forman, 421 U.S. 837, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975); Seger v. Federal Intermediate Credit Bank, 850 F.2d 468 (8th Cir. 1988).

In Reves, the Court was asked to determine whether certain demand notes issued by a farmers cooperative were securities. Because the statute defines "security" to include "any note," the Court began "with the presumption that every note is a

–25–

security." Reves, 494 U.S. at 65, 110 S. Ct. at 951. To rebut that presumption, the Court held, the issuer must show "the note in question 'bear[s] a strong family resemblance' to an item on the judicially crafted list of exceptions, or convince[] the court to add a new instrument to the list." Id., 494 U.S. at 64, 110 S. Ct. at 950 (citations omitted). The Reves approach is not applicable here because "capital credits" are not specificaly included in the statutory definition of "security." Instead, the Supreme Court's more general test applies: "The touchstone [of a security] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Forman, 421 U.S. at 852, 95 S. Ct. at 2060.

Applying that test to this case, we conclude the capital credits lack the essential characteristics of a security. First, the class members enter into the cooperative relationship not in expectation of the profits that will be generated from such a relationship but instead to reap the benefits of that relationship. The capital credits are non-interest bearing and thus do not provide the valuable return on an investment normally expected from the purchase of a security. See e.g., Co-Operative Grain & Supply Co. v. Commissioner of Internal Revenue, 407 F.2d 1158, 1163 (8th Cir. 1969)("Advantages which accrue to a member of a cooperative accrue primarily because of his patronage with the association and not because of any financial investment he may have made therein.")(internal quotation marks and citation omitted).

To bolster its securities' claims, the class seeks to distance its members from the cooperative relationship. It places great emphasis on the fact that a large number of its members received the credits not as members of Farmland but instead in exchange for other instruments they once held in other agricultural cooperatives such as Union Equity or Foods. In the class' view, these holders received the credits in investment exchanges. Yet other class members obtained the credits through conversions of their common stock in Farmland when they became ineligible to hold voting rights. The

–26–

class therefore contends the credits are not incidents of membership but instead are commonly held by non-members.

Regardless of how the Farmland credits were ultimately obtained, all represent equity interests that were initially obtained as an incident of membership in a cooperative. The credits were not sold to members of the investing public or for that matter to members of the cooperative. Rather, the equity interests now represented by the capital credits whether issued by Farmland as part of an exchange, a conversion, or as part of a patronage refund or dividend are in fact incidents of the cooperative relationship.

Second, the capital credits were not issued to raise money for the general business use of Farmland or to finance substantial investments. Their issuance did, however, allow Farmland to retain substantial sums of money which provided an equity basis and was used to finance its operations. There is no common trading for speculation of investment of the capital securities. They are not offered for sale by Farmland at all. Instead, Farmland, on its own initiative, provides its members, former members, or patrons the capital credits during what is to the holder an exchange or conversion of stock and/or the provision of a patronage refund.

Third, the capital credits are not fundamentally an investment. Although Farmland did characterize their member's equity interests as an investment in some publications and referred to the capital credits as securities, it is clear that the class knew the capital credits did not bear interest and were not readily convertible into cash. Further, the credits were transferable only with the consent of Farmland's Board.

The class suggests the district court erred by putting too much weight on the supposed limitation on the right to transfer and failed to follow Reves stated deference to public perceptions. We disagree. Farmland's articles of incorporation clearly

require consent of the board of directors for transfer of capital credits. The back of the capital credit certificates also states the "capital credits of this Association may be transferred . . . only with the consent of the Board of Directors of the Association." Cl. Appendix, at 339. The credits are therefore not freely transferable. Moreover, Reves does not require deference to public perception. Instead, Reves requires the court to consider the reasonable expectations of the investing public. Farmland's registration of the credits as securities and its reference in various communications to the credits as securities and investments weighs in favor of a finding that the public perception was the credits were securities. However, the characteristics of the credits themselves provide countervailing factors that would lead a reasonable person to question the characterization of the credits as investments or securities. The capital credits are patronage refunds or equity interests reflecting a membership or former membership in the cooperative and/or commercial transactions conducted with Farmland or an entity Farmland now owns. The credits earn no interest, pay no dividends, do not appreciate in value, and have no liquidity, i.e., the credits were not freely transferable, were not traded on any securities exchange, and, in fact, had no secondary market. The sole value of the capital credits lies in future redemption at face amount. Given this, the public perception factor does not weigh heavily on the determination of whether the credits are securities.

While there is no other regulatory scheme applicable to the capital credits, patrons of a cooperative ordinarily base their decisions to join a cooperative on the effectiveness of the services provided rather than on the risk inherent in an investment. Regulation as a security would do little to protect or advance the interests of the cooperatives' members or patrons.

In Howey, the Supreme Court established a test to be utilized in determining whether an investment contract is a security within the meaning of the federal securities laws. S.E.C. v. W.J. Howey Co., 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). The instrument is a security if (1) there is an investment of money, (2)

in a common enterprise, (3) with the reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others. This same test has been applied to participations. See Union Nat. Bank of Little Rock v. Farmers Bank, 786 F.2d 881, 884 (8th Cir. 1986)("For a participation to be considered a security under the Act, it must satisfy the elements of a test developed in S.E.C. v. W.J. Howey Co., 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).").

Here there was no investment of money in the traditional sense; that is, the class members did not invest capital with a reasonable expectation of receiving a return on their investment. Rather, class members obtained the Type 12 capital credits either through conversion of their common stock into capital credits, an exchange of equity from one entity to another, or as part of a patronage refund. In other words, the capital credits were received as part of the commercial relationship that exists between an agricultural cooperative and its members, patrons, and former members.

Further, any distribution of "profits" were patronage refunds, i.e., a price or cost adjustment, resulting from the member's own transactions with Farmland. Patronage refunds are not based on Farmland's activities or its utilization of the member's funds. While the possibility exists for the distribution of "profits" from non-member transactions, there is no evidence indicating that any class members ever received a distribution which included "surplus funds" much less evidence that these distributions occurred on a regular basis.[6] See 14 Neil E. Harl, Agricultural Law § 136.01[3] at 136-14 to 136-15 (2d ed. 1991)("A cooperative that distributes to members earnings made from handling non-members' business is making a distribution of profits rather than of patronage dividends. If such distributions occur on a regular basis, a member's interest would meet the requirements for a security."). We disagree with the class' assessment of the import of Cleberg's deposition testimony. Cleberg testified the

---

[6]As of January 25, 1996, Farmland's surplus was "creeping up on $200 million." Cl. Appendix, at 853.

surplus could, in the Board's discretion, be used to "pay out a higher percentage of cash to the members or to reduce the base capital equity requirements on the subscription formula to the members." Cl. Appendix, at 853. However, when asked whether he could "trace profits generated from non-member business as to whether and when the profits are distributed to members?" Cleberg answered, "No." Cl. Appendix, at 852. He did not testify, as the class suggests, that Farmland distributes earnings from non-members in the form of cash and as a reduction in member base capital requirements. He merely testified that the surplus funds could be used for those purposes.

Although there was some effort on Farmland's part to create a secondary market for the capital credits, the class has produced no evidence showing that Farmland was successful in this endeavor or that the capital credits were ever actively traded.

We also reject the class' argument that Farmland is somehow estopped from asserting the capital credits are not securities because it registered them as securities and referred to them as securities in various written and oral communications. It is the economic substance of the particular instrument or arrangement and not the labels used by the parties that determines whether a security is involved. The district court correctly concluded that the capital credits lacked the essential characteristics of a security and that no genuine issues of material fact existed.

IV. The Breach of Fiduciary Duty Claims

The class contends that by directing and overseeing the creation and issuance of the Type 12 capital credits, and by refusing to redeem the credits, Cleberg and Shively breached their fiduciary duties to the class. "Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders. This duty requires the officer or director to work

for the general interests of the corporation." <u>Miller v. Foulston, Siefkin, Powers &</u> <u>Eberhardt,</u> 790 P.2d 404, 415 (Kan. 1990).

A fiduciary's duties encompass both a duty of care and a duty of loyalty. <u>See</u> <u>e.g.,</u> <u>Delano v. Kitch</u>, 663 F.2d 990, 995 & 998 n.9 (8th Cir. 1981)(duty of loyalty); <u>Sampson v. Hunt</u>, 665 P.2d 743 (Kan. 1983)(duty of care). <u>See also</u> <u>Richards</u>, 879 P.2d at 649 (employing a burden-shifting approach to a duty of loyalty case) (<u>citing</u> <u>Cookies Food Products, Inc. v. Lakes Warehouse Distributing, Inc.</u>, 430 N.W.2d 447 (Iowa 1988)). "Most disagreements are over corporate policy and hence involve only the fiduciary's duty of due care." <u>Delano</u>, 663 F.2d at 998 n.9.

With respect to the duty of care, "[t]he standard of duty by which the conduct of a director of a corporation is to be judged should be that measure of attention, care, and ability which the ordinary director and officer of corporations of a similar kind would be reasonably and properly expected to bestow upon the affairs of the corporation." <u>Federal Savings & Loan Ins. Corp. v. Huff</u>, 704 P.2d 372, 378 (Kan. 1985)(<u>citing</u> <u>Speer v. Dighton Grain, Inc.</u>, 624 P.2d 952 (Kan. 1981)). The "[d]irectors and officers are liable to the corporation and the stockholders for losses resulting from their malfeasance, misfeasance or their failure or neglect to discharge the duties imposed by their offices." <u>Id.</u>

However, directors have the power to control and direct the affairs of the corporation, and in the absence of fraud, Kansas courts will generally not interfere on behalf of a dissatisfied stockholder with the discretion of the directors on questions of corporate management, policy or business. <u>See</u> <u>Richards v. Bryan</u> 879 P.2d 638, 648 (Kan. Ct. App. 1994). This rule, commonly referred to as the business judgment rule, shields a director from liability in the case of good faith decisions within the director's discretion.

For reversal, the class first argues the Type 12 capital credits were a "new class" or "new series" of stock and were created, in violation of the Kansas Corporation Code (the "Code"), Kan. Stat. Ann. § 17-6401(a), without proper authority or public disclosure. The class asserts that the district court erred when it held that Farmland's actions were governed by the Kansas Cooperative Marketing Act (the "Act") rather than the Code.

We disagree. Under the Code, "[e]very corporation . . . may issue one or more classes of stock or one or more series of stock within any class thereof . . . as shall be stated and expressed in the articles of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its articles of incorporation." Kan. Stat. Ann. § 17-6401(a). The Act provides that: "[t]he provisions of the general corporation code of this state and all powers and rights thereunder shall apply to the associations organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of this act, or acts amendatory thereto." Kan. Stat. Ann. § 17-1628.

Under the Act:

> capital stock may be divided into preferred and common stock. If so divided, the application for charter must contain a statement of the number of shares of stock to which preference is granted and the number of shares of stock to which no preference is granted and the nature and extent of the preference and privileges granted to each.

Kan. Stat. Ann. § 17-1607(b).

Since the Act explicitly addresses the contents of a cooperative's articles of incorporation including the requirement that the articles contains specific information

about the cooperative's capital stock, application of the Code's different requirements with respect to equity interests would "directly conflict" with the Act. The district court correctly concluded Farmland's actions were governed by the Act.

In the class' opinion, Type 12 capital credits were a new class of stock and not patronage equity. According to the class, Farmland's redemption of the capital credits highlights the difference in the classes. It points out that Farmland has treated the "Series of Ten" credits in a more favorable manner than the "Type 12" credits in that it redeemed "Series of Ten" credits in full before redeeming any of the "Type 12" credits – thereby differentiating between the two types of credits.

We find the class' arguments unpersuasive. The capital credits were clearly a type of patronage equity and the Act does not require that this type of equity be listed or described in the articles of incorporation. Type 12 and Series of 10 capital credits are identical in that they carry no voting rights, pay no dividends or interest, share equally in liquidation, and are all redeemable at the discretion of the Board.

Second, the class asserts that Farmland's bylaws specifically mandate that the capital credits be retired in the order of their issuance. Thus, the class asserts that Cleberg and Shively breached their fiduciary duty by failing to redeem the Type 12 credits. The Kansas Supreme Court has stated that the "[b]ylaws of a cooperative association organized under K.S.A. 17-1601 et seq. are a contract between the cooperative and its members or stockholders and govern transactions between them." Atchison County Farmers Union Co-op Association v. Turnbull, 736 P.2d 917, 921 (Kan. 1987). If the bylaws require mandatory redemption of equity, the Kansas courts will compel payment. See Claassen v. Farmers Grain Cooperative, 490 P.2d 376, 379-80 (Kan. 1971).

The class contends Farmland's bylaws mandate redemption and cite to a section of Farmland's prospectus, dated June 11, 1991, which states: "Farmland Capital Credits shall be retired in the order of their issuance or entry, by years, as and when

the financial condition of Farmland will permit, as conclusively determined by Farmland's members." Cl. Appendix, at 289. The class fails to quote the remainder of the section regarding retirement of equity interests. The section continues by saying:

> In its discretion, Farmland's Board of Directors may at any time or times authorize the retirement of any such credits, in whole or in part, ahead of priority, in order to facilitate the liquidation of a member association or to enable it to retire the equities of a deceased member. If the amount available for retirement of a series is less than the total amount of such series, the series shall be retired on a pro rata basis.

> The Farmland Board of Directors will consider, in its full discretion, as provided in Articles of Incorporation and Bylaws of Farmland, the retirement of . . . Capital Credits held by producers who are natural persons upon the death of such natural person or upon the request of the member-owner who is age 65 or older, provided that the stock or credits to be retired have been issued and outstanding to the natural person for at least five (5) years.

Cl. Appendix, at 289.

Contrary to the class' assertion, the board clearly had discretionary authority with respect to the retirement of the capital credits. Even the passage relied on by the class, which appears in a prospectus and not in the articles of incorporation or bylaws, included the right to retire such credits "ahead of priority" under stated circumstances. Section 5 of the Articles of incorporation provide that the "Board of Directors, in its sole discretion, may at any time or times and on any basis deemed appropriate authorize the transfer or retirement of any capital credits, in whole or in part." Fml'd

Appendix, at 174. The capital credit certificates incorporate the Articles of incorporation and also refer specifically to section 5. Cl. Appendix, at 339.

Finally, the class asserts that Shively and Cleberg made several misrepresentations in relation to the issuance of the capital credits and falsely represented to members of the class, by, for example, signing the registration statement, that the credits would have value through the redemption plan. Although Farmland has an obligation to redeem the credits at some point, nothing in the articles or the bylaws specify a time frame for redemption. Rather, the discretion granted to the Board in connection with the redemption of capital credits, of necessity, includes the Board's determination of the timing of the redemptions and Farmland's financial ability to redeem the credits. Farmland utilizes the retainage funds in the interim to finance operations. It is not uncommon for a cooperative to redeem patronage dividends many years after the dividends have been allocated. See e.g., Gold Kist, Inc. v. Commissioner of Internal Revenue, 110 F.3d 769 (11th Cir. 1997)(cooperative's typical holding period for patronage dividends was twenty years); In re Bonnema, 219 B.R. 951 (Bankr. N.D. Tex. 1998)(Patronage dividends will eventually be paid to patrons in cash, but often this occurs many years after the dividends have been allocated). The district court correctly concluded the class had failed to present sufficient evidence from which the trier of fact could find director self interest, fraud, or an abuse of discretion sufficient to overcome the business judgment rule.

V. The Unjust Enrichment Claim

The class asserts the district court erred when it concluded the Kansas courts would not allow resort to the equitable cause of action for unjust enrichment when the equitable remedy would nullify statutory law and result in the substitution of the trier of fact's own view for that of the cooperative's board of directors. In so ruling, the district court considered: the general rule that unjust enrichment is not available where

–35–

there is an express contract; Kansas' public policy of encouraging cooperative marketing associations; decisions of the Kansas courts indicating disfavor for equitable setoffs against cooperative marketing associations and disfavor for allowing the trier of fact to substitute its judgment for that of the cooperative's board. Although the district court noted there are significant differences between a corporation's bylaws and traditional contracts, it nevertheless concluded a cause of action for unjust enrichment would not be appropriate in this situation.

The gist of the class' claims are that the Board has acted unfairly, or illegally, in making its decisions regarding the creation, distribution, and redemption of Type 12 capital credits. Under Kansas law, to prevail on a claim of unjust enrichment, there must be: " '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.' " Haz-Mat Response, Inc. v. Certified Waste Services Ltd., 910 P.2d 839 (Kan. 1996) (quoting J.W. Thompson Co. v. Welles Products Corp., 758 P.2d 738 (Kan. 1988)).

We conclude the district court correctly dismissed the unjust enrichment claim. Allowing such a remedy under the circumstances of this case would amount to the court's instituting its own equity redemption plan for that of the board and eviscerating the discretion specifically placed with the board of directors. No unfair transactions occurred which resulted in unjust enrichment for Clerberg or Shively. Hunt v. Dresie, 740 P.2d 1046, 1053 (Kan. 1987). It is not inequitable to allow the board to exercise the discretion it has been granted to determine when the cooperative is financially able to redeem patronage equity.

The judgment is affirmed.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.